STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
RAYMOND HALE WELCH, DEFENDANT-APPELLANT.

Argued September 14, 1965—Decided November 22, 1965.

*Mr. Roger C. Ward* argued the cause for appellant (*Messrs. Pitney, Hardin & Kipp,* attorneys).

*Mr. Barry H. Evenchick,* Assistant Prosecutor of Essex County, argued the cause for respondent (*Mr. Brendan T. Byrne,* Prosecutor of Essex County, attorney).

The opinion of the court was delivered by

FRANCIS, J. In this post-conviction proceeding instituted under *R. R.* 3:10A on April 28, 1964 petitioner Raymond

Welch seeks the vacation or reversal of his 1949 conviction of first degree murder. The county court denied relief and this appeal brings the propriety of the denial to us for review.

Welch became 16 years of age on February 22, 1949. Nine days later on March 3, 1949 he and a friend, Frederick Januszkiewicz, about the same age, bought two .22 caliber rifles and a quantity of bullets and took them to the South Mountain Reservation in Maplewood, New Jersey to do some shooting. They were not hunting or shooting on a target range. They were simply skylarking with the rifles, firing indiscriminately at trees and other objects. While there Welch shot and killed Januszkiewicz. He was indicted for felony murder, the State contending the purpose was to rob the victim of a sum of money Welch knew was on his person.

Welch went to trial on December 5, 1949 before the late County Judge Joseph E. Conlon, an able and experienced judge, and a jury. He was represented by experienced attorneys who were assigned because of his indigency. The senior counsel had been a Juvenile and Domestic Relations Court judge and an Assistant Prosecutor for a number of years. On December 13, 1949 the jury found him guilty of murder in the first degree and recommended life imprisonment. On January 18, 1950 the mandatory life sentence was imposed and Welch was confined to State Prison.

On January 27, 1950 counsel for Welch filed a notice of appeal to the Supreme Court from the conviction. This was well within the time then prescribed for the taking of an appeal. *Rule* 1:2–5(b). When the notice was filed in the county court on January 27, 1950 certain avenues of relief were available for indigent appellants in criminal cases. Under *Rule* 1:2–27(a) such an appellant was authorized to file a verified petition with the Supreme Court reciting his poverty and asking for waiver of filing fees, the deposit for costs and for leave to file typewritten, multigraphed or mimeographed copies of his brief and appendix. Such relief was granted ordinarily almost as of course. No such petition was filed in this case.

*Rule* 1:2–27(a), however, did not relate to the furnishing of a transcript of the trial testimony to an indigent defendant. Under subsection (b) of *Rule* 1:2–27 in murder cases where the death penalty had been imposed, an appealing indigent defendant was entitled as of right to an order of the trial court directing the treasurer of the appropriate county to pay for the cost of providing the transcript. That provision was not applicable here because Welch had been sentenced to life imprisonment. Thus, although he had a right of appeal to this Court, *N. J. Const., Art.* VI, § V, ¶ 1(c); *Rule* 1:2–1(c); *Midler v. Heinowitz,* 10 *N. J.* 123 (1952); *State v. Cynkowski,* 10 *N. J.* 571, 575 (1952), the remedy was an empty one if he could not perfect it without the trial testimony, and his indigency made it impossible for him to furnish the transcript himself. See *State v. Bentley,* 46 *N. J. Super.* 193 (*App. Div.* 1957).

Three facts are obvious from the full record here: (1) Welch's principal ground of appeal from his conviction was that the purported confession put in evidence against him at the trial, without which the conviction would not have been obtained, was involuntary and the product of coercion on the part of law enforcement officers. This was a ground of federal constitutional dimensions. *Fay v. Noia,* 372 *U. S.* 391, 83 *S. Ct.* 822, 9 *L. Ed. 2d* 837 (1963); *Townsend v. Sain,* 372 *U. S.* 293, 83 *S. Ct.* 745, 9 *L. Ed. 2d* 770 (1963); (2) In order to present that question properly and adequately to the appellate tribunal a transcript of the testimony was not only essential to him, but was required by court rules, *Rule* 1:2–4; *Rule* 1:3–11; now *R. R.* 1:2–8; (3) The transcript was neither ordered nor furnished by Welch because of indigency.

Some months after filing the notice of appeal defense attorneys made a last straw effort under *N. J. S. A.* 22:1A–3, *L.* 1949, *c.* 193, § 3 (now *N. J. S.* 22A:2–3) to obtain court assistance in procuring the transcript. In June 1950 a verified petition was filed in the Supreme Court requesting a "special rule" thereunder directing the Essex County Treasurer to defray the expense of appeal. The statute provides:

"The Supreme Court may by general rule, or by a special rule in any action pending therein, make such order for the payment of the cost of the transcript and of printing the briefs, appendices, and other proceedings, and other disbursements and expenses by either party, *and the taxation and allowance thereof in the bill of costs*, as the court may deem just." (Emphasis added)

The petition recited the indigency of the defendant and his family, the appointment of counsel by the trial court on account of the indigency, the conviction after trial and the filing of the notice of appeal. It contained also a representation by counsel that in their judgment meritorious questions existed justifying an appeal, particularly respecting the admissibility of Welch's alleged confession "which formed the basis of the State's case." It concluded by pointing out there was no statutory provision authorizing the trial judge to order the payment of appeal costs, and requesting a special rule providing for their payment as a county expense. On June 27, 1950 the application was denied by an order saying "the motion for leave to appeal *in forma pauperis* is denied." No memorandum or opinion giving reasons for the action was filed. No review of the order was sought in the United States Supreme Court.

It seems likely the Court held the view the statute was not applicable. It was then and is now part of the Fees and Costs Act. Its design is to authorize the Supreme Court to deal by general rule, or by special order in a particular case, with the costs of appeal, and their allocation and taxation in the bill of costs, as between parties in civil cases. *Cf. United States Pipe, etc. v. United Steelworkers of America*, 37 N. J. 343, 355 (1962). Nowhere did the statute empower the Court to issue a separate directive to a county treasurer to pay the cost of a transcript for an indigent criminal defendant. It was not considered at that time that costs would run against the State in favor of a defendant in a criminal case in the absence of a specific statute. *State v. Borg*, 9 N. J. Misc. 261, 153 A., 374 (*Sup. Ct.* 1931); 20 *Am. Jur. 2d, Costs,* § 107 (1965); and, see *N. J. S.* 2A:15-60. (In 1956 the Legislature granted limited authority to order transcripts. *L.* 1956,

*c.* 134; *N. J. S.* 2A:152–17; *R. R.* 1:2–7(c).) These reasons strongly suggest the conclusion the Court did not consider that the 1949 amendment to the Fees and Costs Act supplied a means of relieving Welch of his transcript expense burden.

There is a possibility, of course, that the Court regarded the time lapse between the filing of the notice of appeal and the application for relief under the 1949 statute, as constituting lack of diligent prosecution of the appeal. See *Rule* 1:2–29 (now *R. R.* 1:4–2). But we consider that suggestion unlikely in the extreme, especially since the prosecutor had made no motion to dismiss the appeal for that reason.

It is thus apparent that in 1949–1950 an impecunious defendant who had been convicted of first degree murder but condemned to life in prison and not to death had no way of effectuating his right of appeal, no matter how erroneous that conviction might have been.

Six months after denial of the free transcript by this Court, the Clerk served upon Welch's attorneys a notice to dismiss his appeal for lack of prosecution. On February 7, 1951 a stipulation of dismissal signed by the prosecutor and senior defense counsel was filed in response to the motion. Welch had no knowledge of the stipulation; he was not consulted about it. At the hearing in the post-conviction proceeding counsel made plain that since Welch and his family were indigent and there was no statutory authorization for a free transcript, he had no basis on which to resist the administrative motion to dismiss the appeal, and therefore he agreed to the stipulation of dismissal.

Some years after the dismissal this Court appointed an attorney at Welch's request to investigate his age when the homicide was committed. In 1957 a report was made confirming the birth date of February 22, 1933 and thus the jurisdiction of the county court to try the indictment. The matter then rested until April 28, 1964 when the present proceeding began.

In the meantime *Griffin v. People of State of Illinois*, 351 *U. S.* 12, 76 *S. Ct.* 585, 100 *L. Ed.* 891 (1956), was decided.

There Griffin had been convicted of armed robbery. Immediately thereafter, alleging indigency, he moved in the trial court that a certified copy of the entire record, including a transcript of the testimony be furnished without cost to enable him to pursue an appeal. In Illinois, like New Jersey, such a convicted defendant had a right of appeal, and also like New Jersey, in order to obtain the desired full appellate review of trial errors it was necessary for Griffin to submit a transcript of the testimony. Again, in Illinois as in New Jersey at that time, only indigent defendants who had been sentenced to death were entitled to free transcripts at the expense of the county. All others convicted in criminal cases who needed a transcript for appeal had to pay for it whether indigent or not. Griffin's motion was denied without a hearing.

In a post-conviction proceeding the United States Supreme Court held denial of the free transcript violated the due process and equal protection clauses of the Fourteenth Amendment. The court said that since appellate review as of right in Illinois was an integral part of the system for adjudicating guilt or innocence in a criminal case, at all stages of the proceedings these clauses protected indigents from invidious discrimination. More particularly, Justice Black said:

"All of the States now provide some method of appeal from criminal convictions, recognizing the importance of appellate review to a correct adjudication of guilt or innocence. Statistics show that a substantial portion of criminal convictions are reversed by state appellate courts. Thus to deny adequate review to the poor means that many of them may lose their life, liberty or property because of unjust convictions which appellate courts would set aside. Many States have recognized this and provided aid for convicted defendants who have a right to appeal and need a transcript but are unable to pay for it. A few have not. Such a denial is a misfit in a country dedicated to affording equal justice to all and special privileges to none in the administration of its criminal law. There can be no equal justice where the kind of trial a man gets depends on the amount of money he has. Destitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts." 351 *U. S.*, at *pp.* 18–19, 76 *S. Ct.*, at *pp.* 590–591.

The petition here is predicated largely upon the decision in *Griffin v. People of State of Illinois*. But it does not rest only on the allegation that Welch was denied his right of appeal in violation of the Fourteenth Amendment. It charges also that at the trial in 1949 his confession was admitted in evidence against him in violation of his rights under the Fifth and Fourteenth Amendments. More particularly it alleges he was a person of limited mental capacity, being classified as a borderline mental defective, that he was held incommunicado for more than two days after his arrest during which time he was subjected to prolonged and unfair interrogation until exhausted and confused, and that the confession he signed was the result of coercion and improper treatment. And the petition asserts that by reason of the failure of the State to furnish him with a transcript of the trial testimony, and the consequent dismissal of his appeal he was prevented from obtaining an appellate review of the admissibility of his confession.

The petition concludes with a request for a hearing and that Welch be supplied with a trial transcript without cost but pursuant to *N. J. S.* 2A:152–17, 18; *L.* 1956, *c.* 134. Section 17 authorizes the appropriate county court or the Appellate Division to order such a transcript for an indigent convicted defendant at county expense where it is necessary for a proceeding in the trial court or in the Appellate Division. (Attention is called to what may be a legislative oversight. In capital cases appeal from the trial court is directly to the Supreme Court. *N. J. S.* 2A:152–17 deals only with proceedings in the trial court and Appellate Division. *N. J. S.* 2A:152–15 relating to capital cases empowers the court before whom an indigent accused "is to be tried" to give him a free transcript when necessary "for his defense." *N. J. S.* 2A:152–16 authorizes the trial judge in capital cases to order an expense-free trial transcript for purposes of an appeal by a convicted indigent defendant who has been sentenced to death. Even though there may appear to be an omission in the statute respecting a transcript for an indigent defendant con-

victed of first-degree murder and sentenced to life imprisonment and who must appeal directly to the Supreme Court, we have no doubt as to the duty or authority of the appropriate court to order a free transcript in aid of his appeal. *Cf. State ex rel. Marshall v. Eighth Judicial District Court, Nev.,* 396 *P. 2d* 680 (*Sup. Ct.* 1964).)

At the post-conviction hearing in the county court Welch furnished testimony and documents clearly showing indigency at the time of his trial and abortive appeal, and the facts already detailed above attending the dismissal of the appeal. When he undertook to offer evidence relating to the circumstances of his arrest, his school record, mental capacity, almost nonexistent reading and writing ability, and facts surrounding the giving of his confession, the State objected substantially on the ground that the issue of voluntariness was *res judicata.* The assistant prosecutor contended the confession having been admitted at the trial on the presiding judge's finding of voluntariness (in those days the issue of competency, *i.e.,* voluntariness, was solely a court question—see *State v. Bunk,* 4 *N. J.* 461, 470 (1950)), and Welch's appeal having been dismissed by consent following the 1950 order of the Supreme Court denying a free transcript, he was foreclosed from attacking the validity of the confession in a post-conviction proceeding, and the Supreme Court order denying a free transcript and the consequent stipulated dismissal were binding on the county court. The trial court agreed with the prosecutor, and originally sustained the objection, but at counsel's request in order to make an appeal record, sensibly allowed the proof to be introduced. This proof consisted mainly of a transcript of Welch's testimony at the original trial, a psychiatric report of an examination made prior to that trial, and a retelling by Welch of the circumstances leading up to and surrounding the shooting of Januszkiewicz and his subsequent confession of the killing as a felony murder.

Although substantial evidence was introduced by Welch to demonstrate the coerced character of the confession, the State announced it would not present any proof respecting volun-

tariness. Introduction of such proof was thought to be unnecessary in view of the court's statement that it considered dismissal of the Supreme Court appeal dispositive of the issue. As it turns out it might have been better if the State had put in its full proof again as to the validity of the confession, because petitioner's brief now submitted to this Court suggests a willingness to have the question decided on the record in this proceeding. However, the position of the State below is understandable and should not result in any prejudice thereto in this Court.

The case is an unusual one because of the dismissal of the original appeal. Perhaps if a transcript of the trial were available the matter could have been handled practically by a motion in this Court to reinstate the appeal. Actually there never was an order of dismissal. But such a course of action was not feasible as will appear hereafter.

At the hearing below it developed further that only a few portions of the testimony taken at the criminal trial had been transcribed. They were the defendant's direct and cross-examination and the testimony of the Chief of the Essex County Park Police to whom Welch was said to have made his first inculpatory admission. These portions appear to have been written during the trial and probably at the direction of the trial judge to aid him in passing upon the admissibility of the written confession. Unfortunately no more of the testimony can be made available now because the stenographic notes of the trial have been destroyed. Both of the court reporters who officiated so testified. So it is impossible to perfect a record of the original trial for use in post-conviction proceedings, or, on appeal, if this Court were disposed to reinstate the original appeal or to allow an appeal at this time.

In the face of this deficiency, and the impossibility of reconstructing a record that would permit adequate review, Welch contends the conviction should be vacated and he should be discharged or remanded for a retrial on the indictment. On the other hand the State, relying on *Norvell v. State of Illinois*, 373 *U. S.* 420, 83 *S. Ct.* 1366, 10 *L. Ed. 2d*

456 (1963), urges that the impossibility of perfecting an appeal or review record at this late date, more than 15 years after conviction is simply a vicissitude of time and should not be charged to it; therefore relief should be denied and the conviction allowed to stand.

In *Norvell* the defendant was convicted of murder in 1941 and sentenced to 199 years in prison. He was indigent but was represented by an attorney at the trial. On the day of sentence the record noted that on motion defendant was allowed 90 days in which to prepare and file his bill of exceptions. Norvell tried to obtain a transcript; whether this was done *pro se* or through his attorney did not appear. It was shown, however, that because of his indigency he could not pay for a transcript and therefore did not obtain it; nor did he pursue an appeal.

In 1956, after *Griffin v. People of State of Illinois* was decided, Norvell applied to the trial court for a transcript and an order was entered that it be supplied. Then it developed that the official reporter had died some years earlier and no one could read his notes. Moreover, in spite of effort a transcript could not be reconstructed. On this showing a motion for a new trial was denied. The Supreme Court of Illinois sustained the ruling. *People v. Norvell*, 25 *Ill. 2d* 169, 183 *N. E. 2d* 719 (1962). On *certiorari* the United States Supreme Court affirmed, Justice Douglas saying for six members of the court:

"The issue in this case is whether Illinois has made an 'invidious discrimination' against petitioner. \* \* \* More precisely, the question is whether when a transcript cannot subsequently be obtained or reconstructed through no fault of the State, may it constitutionally draw the line against indigents who had lawyers at their trial but after conviction did not pursue their remedy?" 373 *U. S.*, at *p.* 422, 83 *S. Ct.*, at *p.* 1368.

"We do not say that petitioner, having had a lawyer, could be found to have waived his rights on appeal. We only hold that a State, in applying Griffin v. Illinois to situations where no transcript of the trial is available due to the death of the court reporter, may without violation of the Due Process or Equal Protection Clause deny relief to those who, at the time of trial, had a lawyer and who presumably had

his continuing services for purposes of appeal and yet failed to pursue an appeal. Exact equality is no prerequisite of equal protection of the laws within the meaning of the Fourteenth Amendment.

\* \* \* \* \* \* \* \*

When, through no fault of the State, transcripts of criminal trials are no longer available because of the death of the court reporter, some practical accommodation must be made. We repeat what was said in Metropolis Theatre Co. v. Chicago, 228 U. S. 61, 69–70, 33 S. Ct. 441, 443, 57 L. Ed. 730 [734]:

'The problems of government are practical ones and may justify, if they do not require, rough accommodations,—illogical, it may be, and unscientific. \* \* \* What is best is not always discernible; the wisdom of any choice may be disputed or condemned.'

The 'rough accommodations' made by government do not violate the Equal Protection Clause of the Fourteenth Amendment unless the lines drawn are 'hostile or invidious.' Welch v. Henry, 305 U. S. 134, 144, 59 S. Ct. 121, 124, 83 L. Ed. 87 [92] [118 A. L. R. 1142]. We can make no such condemnation here. For, where transcripts are no longer available, Illinois may rest on the presumption that he who had a lawyer at the trial had one who could protect his rights on appeal." 373 U. S., at p. 424, 83 S. Ct., at p. 1368.

For cases of like import, see *United States ex rel. Smart v. Pate,* 318 *F. 2d* 559 (*7 Cir.* 1963); *State v. Long,* 235 *Md.* 125, 200 *A. 2d* 641 (*Ct. App.* 1964); *People v. McKee,* 25 *Ill. 2d* 553, 185 *N. E. 2d* 682 (*Sup. Ct.* 1962); *Brown v. Warden of the Maryland Penitentiary,* 221 *Md.* 582, 155 *A. 2d* 648 (*Ct. App.* 1959).

Welch contends the case of *Eskridge v. Washington State Board, etc.,* 357 *U. S.* 214, 78 *S. Ct.* 1061, 2 *L. Ed. 2d* 1269 (1958) is controlling. In *Eskridge,* where *Griffin v. People of State of Illinois* was applied retroactively, defendant had been convicted of murder in 1935 and sentenced to life imprisonment. Pursuant to the right of review granted by the Washington Constitution, he filed a timely notice of appeal to the state Supreme Court. The trial judge was authorized by statute to furnish a stenographic transcript of the trial proceedings at public expense to an indigent in aid of his appeal, "if in his opinion justice will thereby be promoted." Alleging indigency and substantial trial errors, Eskridge sought a free transcript. The trial court declined to order it saying the trial had been fair and impartial and in his opinion no grave

or prejudicial errors had occurred therein. A "writ of mandate" was then sought from the Supreme Court to compel the trial judge to order the transcript. The court not only denied the relief sought but at the same time granted the motion of the state to dismiss the appeal for failure to file a transcript of the record.

Twenty-one years later, after the decision in *Griffin,* Eskridge sought *habeas corpus* in the Washington Supreme Court charging that the failure to furnish the free transcript violated his constitutional rights. In spite of the state's concession that the transcript was still available, relief was denied, following which the United States Supreme Court granted *certiorari,* reversed and remanded, apparently to permit perfection of the original or a new appeal from the conviction, saying a state denies a constitutional right guaranteed by the Fourteenth Amendment if it allows all convicted defendants to have appellate review except those who cannot afford to pay for the records of their trials. It went on to say the conclusion of a trial judge that there was no reversible error at the trial cannot be an adequate substitute for the right to the full appellate review available to all defendants who are able to purchase the transcript. More particularly, the *per curiam* opinion said:

"We do not hold that a State must furnish a transcript in every case involving an indigent defendant. But here, as in the *Griffin* case, we do hold that, '[d]estitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts.'" 357 *U. S.,* at *p.* 216, 78 *S. Ct.,* at *p.* 1062.

██ Our study of *Norvell* and *Eskridge* leads us to the view that the sense of both of them against the background of *Griffin* requires a new trial in the present case.

When Welch was sentenced on January 18, 1950, the statute required the court reporter to attach his official seal of authenticity to his original shorthand notes and file them with the clerk of the court, who was under a mandatory duty to preserve them in the public records of the court for five years.

*N. J. S. A.* 2:16–24.7; *L.* 1948, *c.* 376. These notes and any transcript thereof (which was directed also to be filed with the clerk) were required to be open to public inspection. *N. J. S. A.* 2:16–24.8(g). Unfortunately the reporters in Essex County (who are deemed State employees, *N. J. S. A.* 2:16–24.9(i), now *N. J. S. A.* 2A:11–16(i)), did not abide by the statute. Their notes were not certified and filed with the county clerk as required; they were kept in their personal possession for five years or longer. The supervisor seemed to think there was a local rule or custom to retain the notes for ten years. But there was no official directive to that effect from anyone in authority. Under the statute the county clerk had the duty to preserve the stenographic notes for five years or at least until January 18, 1955—if they had been delivered to him as required. What his practice was with respect to the length of time the stenographic notes were or would be preserved, if delivered to him, is not shown by the record. In any event, failure of the reporters to file the *Welch* notes in accordance with the statute deprived the county clerk of the opportunity to apply his discretion with respect to the period of retention.

As of January 1, 1952 Title 2 of the Revised Statutes—Administration of Civil and Criminal Justice—was revised extensively and became the present Title 2A. *L.* 1951, *c.* 344. Generally all statutes relating to matters of practice and procedure which had been committed to the Supreme Court by the *Constitution of* 1947 were repealed and incorporated in the Rules of Civil and Criminal Practice promulgated by the Court. *N. J. S. A.* 2:16–24.7 was repealed and not re-enacted as part of 2A. See *Tables, p.* 16, Title 2A, *N. J. S. A., perm. ed.* Apparently it was lost sight of and not brought into the Supreme Court rules until September 28, 1954. The hiatus, however, could not be deemd to have eliminated the pre-existing statutory duty to retain the reporters' notes at least until January 18, 1955. *L.* 1951, *c.* 344, § 4. *Rule* 1:30–6(d), effective September 28, 1954, imposed the obligation on the court reporter to preserve and store his trial notes at his own

expense for five years. On July 30, 1958 the Administrative
Director of the Courts, at the request of this Court, called the
attention of all the certified court reporters in the State to
*Griffin v. People of State of Illinois* and *Eskridge v. Washington State Board etc., supra,* and advised them not to destroy
their notes in any criminal case "heretofore or hereafter·
taken," except where a transcript thereof has been filed with
the clerk of the court, and directed them to preserve the notes
until further notice. That direction has never been revoked.

At the hearing in this proceeding, one of the court report-
ers at the original trial, who apparently was acting tempo-
rarily as an official reporter, testified he was not aware of a
definite rule regulating the period of retention of his notes.
His "impression" was that they were to be held for five to
seven years. He said with certainty the notes had not been
delivered to the county clerk. It was his recollection they
were destroyed in 1956 about the time he moved to Florida.
Before destroying them he did not consult either the county
supervisor of the official reporters who apparently had called
him in to act temporarily at the *Welch* trial.

The second reporter who took testimony at the trial was an
official one. He said in 1949 it was the practice to retain the
stenographic notes for at least five years, "most often longer."
However, they were not delivered to the county clerk. His
testimony as to the length of retention of the *Welch* notes is
quite ambiguous. He said he discarded them sometime prior
to 1952. He reached that conclusion because he still has in
his possession all notes in criminal cases since 1952. Then he
was asked:

"Q. I understand you to say that you made a practice of saving the
notes for at least 5 years and yet, now, you say that sometime prior to
1952 you discarded the notes of the 1949 trial?
A. Yes, that's right."

When his attention was called to his statement that he
retained notes for at least 5 years, he referred to the 1958
directive of the Administrative Director, mentioned above,

which he said told him to save all criminal trial notes permanently. No notes were destroyed after that directive, so since at the time it was received he had the notes back to 1952, the substance of his testimony seems to be that the pre-1952 notes were discarded sometime prior to 1958; when, he could not recollect; but he "must have kept" the notes of the 1949 trial for more than three years.

Although we have adverted at some length to the situation here with respect to the absence of the stenographic notes of Welch's trial, we do not regard their absence and the consequent impossibility of preparing a transcript of the testimony as reflecting adversely on petitioner's claim for relief. Here, unlike *Norvell v. State of Illinois, supra,* Welch's attorneys filed a notice of appeal and took active steps to perfect the appeal by applying for a free transcript. Judicial refusal of that relief must now be regarded as constituting invidious discrimination under *Griffin v. People of State of Illinois,* and as an unconstitutional deprivation of his right of appeal under the due process and equal protection clauses of the Fourteenth Amendment. As *Griffin* teaches, justice is not equal when the wealthy can obtain adequate appellate review and the destitute who cannot afford to buy the record are remediless. Moreover, *Eskridge v. Washington State Board* makes plain that *Griffin* is to be applied retroactively. Thus we should look at the order of this Court denying petitioner's *in forma pauperis* application for the transcript as if *Griffin* had already been decided. Doing so, we must conclude Welch's right of appeal was denied him by judicial action. More specifically, he was deprived of the right to have determined the important issue whether his alleged confession was received in evidence in violation of the Fifth Amendment of the Federal Constitution. It is true that he did not seek *certiorari* in the United States Supreme Court from the order. Nor at any time since the decision in *Griffin* did he seek *habeas corpus* in the United States District Court. But in the unusual circumstances of the case, and particularly in light of current constitutional doctrine, such failure should not bar

relief. It seems to us justice demands that we now provide the relief which undoubtedly would be forthcoming on the federal scene by virtue of the clearly applicable and controlling opinions of the United States Supreme Court in *Griffin* and *Eskridge*. See also, *Fay v. Noia, supra* (372 *U. S.*, at *pp.* 418–419, 424, 427–432, 434–441, 83 *S. Ct.* 822, 9 *L. Ed.* 2d 837) ; *Lane v. Brown*, 372 *U. S.* 477, 484–485, 83 *S. Ct.* 768, 9 *L. Ed.* 2d 892 (1963) ; *Townsend v. Sain, supra*; Hill, "The Inadequate State Ground," 65 *Colum. L. Rev.* 943, 990–991 (1965) ; Reitz, "Federal Habeas Corpus: Impact of An Abortive State Proceeding," 74 *Harv. L. Rev.* 1315 (1961) ; "State Post-Conviction Remedies and Federal Habeas Corpus," 40 *N. Y. U. L. Rev.* 154, 192 (1965) ; Brennan, "Some Aspects of Federalism," 39 *N. Y. U. L. Rev.* 945, 957–959 (1964).

In *Patterson v. Medberry*, 290 *F. 2d* 275 (10 *Cir.* 1961), *cert.* denied 368 *U. S.* 839, 82 *S. Ct.* 59, 7 *L. Ed. 2d* 39 (1961), Medberry had been convicted of first degree murder in 1939 and sentenced to life imprisonment. He filed a notice of appeal and with a showing of indigency applied to the trial court for a transcript at public expense. The request was denied. The appeal then proceeded and the judgment of conviction was affirmed on a record which did not contain a reporter's transcript of the testimony. The Colorado Supreme Court held the denial of the transcript was within the trial court's discretion which did not appear to have been abused. On federal *habeas corpus* in 1960, it appeared a transcript was not available any longer.

The Circuit Court of Appeals for the Tenth Circuit held under *Griffin* that the state had deprived Medberry of the protection of the Fourteenth Amendment in refusing to provide an indigent with a record adequate for appellate review. Moreover, the court said that where an inadequate record is presented because of such refusal, the taking of an appeal thereon does not destroy his right to review. Nor does "delay in seeking relief from the denial of the right to a transcript * * * defeat that right." 290 *F. 2d*, at *p.* 277. The opinion

concluded by giving Colorado a choice between releasing the prisoner from custody or granting him a new trial.

In *Boles v. Kershner*, 320 *F.* 2d 284 (4 *Cir.* 1963), upon conviction of the indigent Kershner in West Virginia, court-appointed counsel, intending to appeal, was not furnished a transcript of the evidence upon proper request to the trial court. The request made within the time limited for appeal was ignored. On subsequent federal *habeas corpus* it appeared that the state court reporter was dead but his notes were still available. Whether anyone else could read the notes was not shown. The District Court held due process had been denied and ordered the prisoner's release. The Court of Appeals affirmed but directed that the state be given a reasonable time within which to retry Kershner; or furnish him with a transcript of his trial and afford him the appellate review denied him up to that time. See, also, *People v. Mininni*, 21 *A. D.* 2d 811, 250 *N. Y. S.* 2d 930 (*App. Div.* 1964); *State ex rel. Banach v. Boles*, 147 *W. Va.* 850, 131 *S. E.* 2d 722 (*Sup. Ct. App.* 1963).

██ It has been suggested in this case—although the record contains no supporting facts—that perhaps prior to denying a free transcript to Welch, the Supreme Court looked at the few portions of the testimony, including that of Welch, which had been transcribed during the trial. Assuming that was done, it would not suffice as a ground for denying relief at this time. Obviously such a limited *ex parte* study of the trial proceedings could not serve as a substitute for the full and adequate appellate review of the validity of the conviction, and particularly of the voluntariness of the confession, to which a defendant was entitled. The right of review is satisfied only when in the particular case it equals that which an appellant of sufficient means to supply a transcript of the evidence would receive. The hand of the Fourteenth Amendment extends the same distance to the poor as it does to the rich.

A significant case in this area is *Draper v. State of Washington*, 372 *U. S.* 487, 83 *S. Ct.* 774, 9 *L. Ed.* 2d 899 (1963).

Draper had been convicted of robbery and filed a timely notice of appeal *pro se*. Subsequent to the decision in *Eskridge v. Washington State Board etc., supra,* the Supreme Court of Washington had adopted rules to govern trial judges in passing upon requests of indigent defendants for free stenographic transcripts of the trial evidence. The rules, so far as pertinent for present purposes, required defendant's motion for such relief to set forth the fact of indigency, the errors claimed to have been committed at the trial; if it was claimed the evidence was insufficient to support the verdict, the particulars of the insufficiency had to be specified—although not in any technical form. In disposing of the motion the trial court was directed by the rules to make findings of fact as to (a) indigency, (b) which of the alleged errors he considered frivolous and why, (c) whether a narrative form of the evidence would be sufficient for purposes of defendant's appeal and would be made available to him and, if not, (d) what portions of the stenographic transcript would be necessary for the appeal. The disposition was required to be by "definitive" order.

Draper filed the necessary motion papers *pro se*. They were drawn inartistically but asserted a number of trial errors and were accompanied by the statement that unless the testimony was furnished at public expense the appeal could not be prosecuted. The matter was argued orally by Draper and the attorney who represented him at the trial. The prosecutor opposed the motion asserting there was nothing in the record giving substantial support to the claims of error. In addition he filed an affidavit reciting his contrary interpretation of the evidence, as well as the state of the record which he claimed plainly established defendant's guilt. The trial court denied the motion. His order contained findings of fact and his conclusion that the assignments of error were patently frivolous, that defendant's guilt was proved by overwhelming evidence, and a free transcript would be a waste of public funds.

Review of the order was sought in the state Supreme Court where it was affirmed. In doing so, the court set forth a sum-

mary of the facts taken solely from the record of the trial court's findings. The affirmance concluded by dealing briefly with and rejecting the assignments of trial error.

On *certiorari* the United States Supreme Court reversed. It pointed out that it might not be necessary in all cases to provide an indigent with a full transcript of the record. Much would depend upon the nature of the errors asserted. The fact that a wealthy defendant might waste his money unnecessarily by filing a complete record did not mean that public funds must be wasted likewise. So long as a record of "sufficient completeness" for adequate appellate consideration of the errors assigned wis provided, the strictures of *Griffin* and *Eskridge* would be satisfied.

The Court said, however, that the Washington Supreme Court could not deny Draper's request for review of the motion in the trial court without first supplying him with a record of sufficient scope to permit proper consideration of his claims. If such a record were furnished Draper would have been insured a right of review of his conviction as adequate and as effective as that which Washington guarantees to nonindigents. 372 *U. S.*, at *p.* 499, 83 *S. Ct.*, at *p.* 774. "What was impermissible was the total denial to petitioners of any means of getting adequate review on the merits in the State Supreme Court, when no such clog on the process of getting contentions before the * * * Court attends the appeals of defendants with money." 372 *U. S.*, at *p.* 498, 83 *S. Ct.*, at *p.* 780.

Finally the court reiterated the view expressed in *Eskridge* that a conclusion by the trial court based on his recollection of the evidence that no reversible error occurred is not an adequate substitute for full appellate review.

Another case of direct relevance is *Burns v. State of Ohio*, 360 *U. S.* 252, 79 *S. Ct.* 1164, 3 *L. Ed.* 2d 1209 (1959). In 1953 Burns was convicted of burglary and sentenced to life imprisonment. Within the year the conviction was affirmed without opinion by the Ohio Court of Appeals. An immediate notice of appeal was filed but the matter was not pursued

until 1957 when Burns attempted to file a copy of the earlier notice of appeal and a motion for leave to appeal to the Ohio Supreme Court. To these papers were attached an affidavit of poverty declaring he was without funds to pay docket and filing fees. (Despite the delay, the appeal was still timely.) The papers were returned by the clerk of the court with a memorandum stating the Supreme Court had decided on a number of occasions that docket and filing fees took precedence over any statute allowing a pauper's affidavit to be filed in lieu of court fees. The state conceded that under Ohio practice the clerk's letter in reality and effect was the judgment of the Supreme Court.

On *certiorari* in the United States Supreme Court, Ohio contended the case was unlike *Griffin v. People of State of Illinois* because Burns had been given one state court appellate review of his conviction while Griffin's indigency left him with no means of review whatever. The Supreme Court regarded the difference as inconsequential. It said that once a state establishes a course of appellate review in criminal cases, it may not foreclose indigents from access to any phase thereof because of poverty. In remanding the cause to the Supreme Court of Ohio for appropriate relief, Chief Justice Warren, speaking for the court, said:

"The imposition by the State of financial barriers restricting the availability of appellate review for indigent criminal defendants has no place in our heritage of Equal Justice Under Law." 360 *U. S.*, at *p.* 258, 79 *S. Ct.*, at *p.* 1169.

To like effect is *Smith v. Bennett,* 365 *U. S.* 708, 81 *S. Ct.* 895, 6 *L. Ed. 2d* 39 (1961), where a trial court clerk refused to file a petition for *habeas corpus* to review a revocation of parole unless the fees were paid. The Iowa Supreme Court then denied without opinion a motion for leave to appeal *in forma pauperis.* The United States Supreme Court reversed and remanded for appropriate action respecting the filing of the *habeas corpus* petition. In addition to holding that a state may not constitutionally preclude use of the writ of *habeas*

*corpus* by indigent prisoners by the imposition of filing fees, the Court made a comment of significance in the present case:

"The Attorney General of Iowa also argues that indigent prisoners in the State's custody may seek 'vindication of federal rights alleged to have been denied by the state' in the federal courts. But even though this be true—an additional point not involved or passed upon here—it would ill-behoove this great State, whose devotion to the equality of rights is indelibly stamped upon its history, to say to its indigent prisoners seeking to redress what they believe to be the State's wrongs: 'Go to the federal court.' * * *" 365 *U. S.*, at *p.* 713, 81 *S. Ct.*, at *p.* 898.

See also, *Lane v. Brown,* 372 *U. S.* 477, 83 *S. Ct.* 768, 9 *L. Ed. 2d* 892 (1963).

Under all the circumstances present here we are of the view that the unusual facts of Welch's case bring it within the purview of the principles announced in *Griffin, Burns, Smith* and *Eskridge.* Moreover, we find no doctrinal clash with the *Norvell* decision which would militate against relief here. The factual differences with respect to the extent of prosecution of the appeal in the two cases make *Griffin* and its progeny controlling. If Welch had not taken the specific steps described above toward the perfection of his appeal, undoubtedly he would be bound by the pronouncement of the Supreme Court in *Norvell.* Accordingly, the judgment of the trial court must be reversed, and since the impossibility of obtaining a transcript of the testimony at Welch's trial at this date completely frustrates any form of *nunc pro tunc* appeal or other review of the proceedings at that trial, the conviction must be vacated, and the cause remanded for a new trial on the indictment.

So ordered.

WEINTRAUB, C. J. (dissenting). I regret I cannot join in the opinion of the Court. Defendant's case has a certain appeal. He was 16 when the homicide occurred. Now 32, he has already spent half his years in jail. When he was convicted, he wanted a review but at that time there was no pro-

vision for a transcript of the testimony at public expense except in the case of a death sentence. Thus there was not resolved a possibility, albeit slim, that his conviction might have been reversed and a retrial might have led to an acquittal or a lower degree of guilt.[1] Since then the Constitution has been found to assure a transcript.of the trial record for indigents convicted of any crime. Unfortunately defendant cannot now have a review upon a transcript because the stenographic notes, available when he sought an appeal, have since been destroyed.

If no facts militate against it, the parole board could find defendant, apparently otherwise eligible, should now be paroled. That could well be an appropriate adjustment between the interest of society and the interest of this defendant. But the question before us is whether all pre-1956 convictions in cases in which stenographic notes were disposed of after the time for appeal had expired must be set aside upon a showing of indigency and a timely desire to appeal. True, the defendant did file a notice of appeal, but I cannot differentiate between a defendant who took that step and a defendant who did not because he knew a transcript would not be furnished. If only a few cases were involved, I would join the majority, but we cannot know how many defendants, now in or out of

---

[1] There is nothing affirmative to indicate a likelihood of success on the abortive appeal in this case. In their application for a "special rule" for a transcript, trial counsel said in general terms that "meritorious questions exist," then adding that "In the judgment of said attorneys merit particularly attaches itself to the contention that the confession alleged to have been signed by the defendant, and which confession proved the basis of the State's case, was erroneously admitted in evidence." As to the issue thus thought preeminent, the full testimony of the defendant and of the Chief of the Essex County Park Police had already been transcribed and was and still is available. From the face of defendant's testimony itself, it is evident the challenge to the confession would, surely in the year 1950, have presented a pure issue of credibility, and the possibility that Judge Conlon's factual finding would have been reversed on appeal was just about nil. Further, as to issues of law, if any, there is nothing to show a suitable record could not have been prepared, without the aid of a transcript, for the certification of the trial judge.

custody, will assert a claim for relief. I believe the prospects are sufficient to make conspicuous the problem of retroactive application of decisional law.

As the majority opinion points out, an indigent's right to a free transcript was established in *Griffin v. People of State of Illinois*, 351 *U. S.* 12, 76 *S. Ct.* 585, 100 *L. Ed.* 891 (1956). The new rule was held to be retroactive in *Eskridge v. Washington State Board etc.*, 357 *U. S.* 214, 78 *S. Ct.* 1061, 2 *L. Ed. 2d* 1269 (1958). Under *Eskridge* a defendant receives a delayed review, and if the transcript is available, the total interests involved are fairly served by that course. But if the transcript is no longer available, nothing short of a reversal can be ordered and perhaps at a date when the case can no longer be retried with fairness to either side.

It should be stressed that we are not dealing with a case in which a *timely* appeal cannot be heard because of the fortuitous loss of a stenographer's notes. We are dealing with the problem of retroactive application of new constitutional doctrine to final judgments which were already unappealable when the notes, like other old and unneeded records, were destroyed. It seems to me that *Norvell v. State of Illinois*, 373 *U. S.* 420, 83 *S. Ct.* 1366, 10 *L. Ed. 2d* 456 (1963), is precisely in point, and correctly finds that where the transcript is no longer available through no fault of the State (I find no pertinent fault in the present case), the Constitution does not require that the conviction be undone.

I cannot isolate this situation from the sundry others which today present the acute problem of retroactive application of decisional law. There is a strong public interest in the finality of judgments. We ought not dismiss that interest upon a mere speculation that justice was not done. Overall, the great, great probability is that the judgments of our predecessors were true.

If legislators required judicial judgments to be vacated and cases retried whenever they changed their view of what is just and fair, we would think them somewhat mad. Yet, although most of us today recognize that judges make law

just as surely as do the members of the legislative branch, still, somehow, especially when the law being made is in the realm of constitutional doctrine, we are unable to shake the myth that we and we alone have seen some eternal truth. We cannot quite comprehend how the "constitutional" rights of individuals can depend upon the date of decision. We could, if we but understood the most we can say is that we disagree with others no less able and no less devoted to the cause of justice.

We too can expect to be right only for the moment. Hence, with a bit of realism and a touch of humility, we should be content to let our views take care of today and hopefully a part of tomorrow. Indeed, the tempo of change is sure to quicken. For one thing, some critical concepts in this area cannot be maintained in their present posture. Further, there are strong pressures to deal in constitutional and therefore exclusive terms with questions heretofore thought not to stand so high in the scheme of things. If we insist upon reliving the past, a harried judicial process may be overwhelmed. We ought not take that risk upon the pleasant assumption that we alone are the authentic ministers of justice.

Lest there be misunderstanding, I should add the members of our Court are in basic agreement upon the subject of retrospective impact of judge-made law. We differ here only in the application of that view to the specific problem before us.

I would affirm.

HALL and HANEMAN, JJ., join in this dissent.

*For reversal* — Justices JACOBS, FRANCIS, PROCTOR and SCHETTINO—4.

*For affirmance* — Chief Justice WEINTRAUB and Justices HALL and HANEMAN—3.