**Dr. William BAKER et al., Plaintiffs,**

v.

**J. R. STRODE et al., Defendants,**

**Kentucky Farm Bureau Federation, Intervenor.**

**Civ. A. No. 2534.**

United States District Court, W. D. Kentucky, Owensboro Division.

Jan. 26, 1971.

---

1258

Morton Holbrook, Sandidge, Holbrook, Craig & Hager, Owensboro, Ky., for plaintiffs.

William L. Wilson, Owensboro, Ky., Ray Corns, Frankfort, Ky., Jack Heath, Louisville, Ky., Hugh D. Moore, Joseph L. Banken, Owensboro, Ky., for defendants.

John A. Fulton, John P. Sandidge, Woodward, Hobson & Fulton, Louisville, Ky., for intervenor.

Before CELEBREZZE, Circuit Judge, and GORDON and BRATCHER, District Judges.

## OPINION

JAMES F. GORDON, District Judge.

This action arises pursuant to 28 U.S.C. §§ 1331, 1343, 2201–2202, and 42 U.S.C. § 1983 to have declared as invalid, under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Kentucky Constitution, a portion of a Kentucky State statute commonly denominated as the "Rollback Law," specifically Section 160.470(2) thereof, as well as other related statutes to that section and to enjoin their enforcement. This three-judge panel was empaneled pursuant to the provisions of 28 U.S.C. §§ 2281, 2284 to determine the substantial federal constitutional question presented herein.

Plaintiffs are the taxpayer parents of, and students who attend schools operated by the Boards of Education of Daviess County, and the City of Owensboro, Kentucky, and are representative of their like class throughout Kentucky. The Defendants are the Boards of Education above-mentioned, certain of their individual members, the Superintendents of the designated school systems, the Suerintendent of Public Instruction of the Commonwealth and other governmental authorities charged with the ministerial duties of tax levy and collection. The Kentucky Farm Bureau Federation, representing its 105,000 person taxpayer membership throughout Kentucky was allowed to intervene in this action, as a taxpayer and representative of its membership.

The parties have stipulated all factual matters.

This action was filed on January 26, 1971. At that time, there was pending before the Kentucky Court of Appeals an action attacking KRS 160.470(2) as unconstitutional under both the Kentucky Constitution and the United States Constitution under the Equal Protection Clause of the Fourteenth Amendment entitled Miller v. Nunnelley, Ky., 468 S.W.2d 298, certiorari denied, 404 U.S. 941, 92 S.Ct. 286, 30 L.Ed.2d 255. This Court entered an order staying this action until there was a final determination of the Miller case by the Kentucky Court of Appeals in accordance with Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971).

On June 18, 1971, the Kentucky Court of Appeals sustained the constitutionality of the above statute under both Constitutions. A Petition for Certiorari was filed in the Supreme Court of the United States and that Petition was denied on November 9, 1971, as above indicated. The Kentucky Court of Appeals on the same day that it decided Miller v. Nunnelley sustained the "Rollback Law" against an attack as to unconstitutionality as to taxing districts under KRS 132.023, Northern Kentucky Area Planning Com'n. v. Hensley, Ky., 468 S.W.2d 293.[1]

Following all such proceedings, the matter came back before us for hearing and determination.

For clarity certain historical background seems proper.

Section 183 of the Constitution of Kentucky provides that the General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout Kentucky.

In the year 1954, the Kentucky General Assembly enacted a Minimum Foundation Program,[2] expressing its legislative intent in so doing as follows:

" . . . To assure substantially equal public school educational oppor-

---

1. See also Rea v. Gallatin County Fiscal Court, Ky., 422 S.W.2d 134, Mullen v. Board of Education of Harrodsburg, Ky., 440 S.W.2d 261, and Lowery v. County of Jefferson, Ky., 458 S.W.2d 168.

2. Set forth in KRS 157.310 through 157.990.

tunities . . . but not to limit nor to prevent any school district from providing educational services and facilities beyond those assured by the foundation program; and to provide, as additional state funds are made available for the public schools, for the use of such funds for the further equalization of educational opportunities. KRS 157.310 to 157.440 and subsection (2) of KRS 157.990 shall be interpreted as a measure to provide for an efficient system of public schools throughout the Commonwealth . . ., and for the manner of distribution of the public school fund among the districts and its use for public school purposes, as prescribed by Section 186 of the Constitution." KRS 157.310.

Since the enactment of the Minimum Foundation Program the General Assembly biennially has made appropriations for its support. The Foundation Program is based on the principle that the Commonwealth and each local school district will share the cost, as calculated by the State Superintendent of Public Instruction, who computes the total cost of the Foundation Program in a manner not connected in any way with the wealth of the school districts involved, but only with regard to their needs.[3]

Each school board had the option of selecting a basic tax rate for its particular district at any point between the minimum of 25 cents and the maximum of $1.50 per $100.00 of assessed valuation. Though the great majority of the school boards had selected the maximum amount as the rate, the impact of the rate (i. e., effectiveness) varied greatly throughout the state because there was great variety between school districts in the existing *assessment ratios* (ratio of

assessed value to actual value of property). Ranging from 20.02% at the bottom to 45.62% at the top, with a statewide average of 30.14%.

Time marched on until June 8, 1965, when in Russman v. Luckett, 391 S.W.2d 694, the Kentucky Court of Appeals held that Section 172 of the state's Constitution requires all non-exempt property to be assessed for taxation at *its fair cash value,* thus presenting the prospect that the basis of taxable wealth for education, as well as many other purposes, would be more than tripled, i. e., from the average of 30.14% to 100% of fair cash value.

Suffice it to say, such a prospect gave rise to great anxiety and concern and in August, 1965, in Extraordinary Session the General Assembly of Kentucky enacted House Bill No. 1—the "Rollback Law." The legislative intent therefor being expressed as follows:

AN ACT relating to revenue and taxation.

WHEREAS, the courts of this Commonwealth, in exercise of their constitutional function, have determined and directed that property be assessed at its fair cash value; and

WHEREAS, that determination of the courts has been succeeded by great anxiety and uncertainty among the citizens of this Commonwealth; and

WHEREAS, it is the desire of the General Assembly to offer reassurance of fiscal responsibility by limiting the revenues derived from ad valorem taxes to insure that injustices do not devolve upon our people; and

3. There are taken into account dollar amounts under the Program for items of classroom units, instructional salaries, current expenses, capital outlay, qualifications of teachers and transportation costs, which amounts are totaled into a sum which is called the final total cost of the Foundation Program per school district. From this sum there is deducted the re-

quired local tax effort, which has theretofore been arrived at by the multiplication of each district's percentage of the assessed value of its property to the total of the equalized property value of the state as a whole. The resulting sum is the allotment under the Foundation Program to each school district.

WHEREAS, it is the function and duty of this General Assembly to provide the legal framework for fair and equitable taxation to support the services of government which are demanded by its people; and

WHEREAS, there is widespread determination among the people of this Commonwealth that our public services, especially the public school system, shall not be crippled nor impaired by unrealistic or inadequate support; and

WHEREAS, the purpose of taxation is to insure that adequate, but not excessive, revenues are produced in support of essential public services; and

WHEREAS, it is proper and necessary that all taxing districts of this Commonwealth be permitted to function with the approval and consent of those governed in a productive and progressive provision of public services; and

WHEREAS, it is mandatory in our democracy to assure voter participation in the matter of taxation and all public policy; and

WHEREAS, the progress and tranquility of our Commonwealth and our people can be assured best through a common consideration of our common problems and their fair and equitable resolution; and

WHEREAS, it is the duty and the mandate of this Special Assembly to properly and equitably reflect the will of our people to secure their greatest happiness, security and prosperity.

NOW THEREFORE,

*Be it enacted by the General Assembly of the Commonwealth of Kentucky.*

As applied to schools [KRS 160.470 (2)] provides that no school district might submit a budget requiring more revenue from local ad valorem taxes than was produced in the year 1965, exclusive of prior existing voted taxes and net assessment growth (KRS 132.425),[4] plus two permissive 10% increases for the years 1966–67 and 1967–68; but with qualification that these limits *could be exceeded by a vote of the majority of the qualified voters* of a district on referendum held pursuant to the request of a district's school board.[5]

Subsequently, in 1970, and again in 1972, the General Assembly re-enacted KRS 160.470, with various amendments, among them being one to permit recalculation of maximum revenue in those districts having 1965 rates fixed at less than $1.50, by recalculating the maximum amount to be allowed at the rate of $1.50. Thus, permitting, as expressed in

---

4. Net assessment growth as now statutorially defined allows the annual inclusion for school taxation of new properties and improvements added to the tax rolls as well as net revaluation increases of property already on the tax rolls.

5. "157.440. Districts may exceed levies authorized by KRS 157.380 or 160.470, when.—

(1) In addition to the local tax effort required by KRS 157.380, for participation in the equalization account of the public school foundation program fund, such districts or any other district may exceed the maximum provided by subsection (2) of KRS 160.470 provided that, upon request of the board, the tax levying authority of the district shall adopt an ordinance of resolution submitting to the qualified voters of the district, in the manner of submitting and voting as prescribed in paragraph (b) of subsection (1) of KRS 160.477, the question whether a rate which would produce revenues in excess of the maximum provided by subsection (2) of KRS 160.470 shall be levied. If a majority of those voting on the question favor the increased rate, the tax levying authority shall, when the next tax rate for the district is fixed, levy the rate requested by the board not to exceed the rate authorizd by the voters."

Additionally, the General Assembly added certain permissive taxes at a school board's option, they being occupational, utility and income-excise, KRS 160.601; KRS 160.613; KRS 160.621, as well as providing revenue to meet interest and payments on bonded indebtedness, KRS 160.477(7).

the legislative intent of the Act, all school districts to receive revenue on the basis of $1.50, plus assessment growth and the two 10% permissive increases.

Plaintiffs maintain that KRS 160.-470(2) denies them equal protection of the law under the Fourteenth Amendment to the Federal Constitution, in that it does not meet the traditional test for classification as to reasonableness and basis; lacks a fair and substantial relationship to the object of the legislation, in that all persons similarly circumstanced are not treated alike; is both arbitrary and discriminatory, in that it "freezes" ad valorem tax rates and possible revenues at a moment in history, and projects into the future prior existing unequal treatment and arbitrary classifications of local tax assessment, all having no rational relationship to the school population, needs, community wealth or other relevant standards.

Defendants and Intervenors counter plaintiffs' assertions by maintaining that Nunnelley v. Miller, *supra* (cert. den.) forecloses our consideration of all constitutional questions; that this action is proscribed by 28 U.S.C. § 1341; and last, and foremost, that the classification made by the Kentucky Legislature is based upon experience and history, with a direct relationship to accomplishment of purpose and objective, thus possessing a rational basis coupled with a compelling state interest in the granting of final taxing authority to the people.

Before expressing ourselves as to the above contentions, we wish to make it plain what this case is *not* about. In this action no attack is made on the Kentucky Minimum Foundation Program. The attack focuses on what is maintained to be an alleged total "freeze" upon the maximum amount of local ad valorem tax that school board members may impose upon the people of their school district (without giving any regard to the option of a school board to conduct a referendum and to levy other permissive increases expressed within the statute).[6] Therefore, it can be seen that an adoption by us of plaintiffs' contentions would not result in uniform tax rates in Kentucky's various school districts nor in equalization of expendable tax dollars per pupil throughout the State, but rather in a complete unbridling of the amount of tax dollars the school board itself could levy upon its constitutents (without referendum), thus amplifying any existing inequities.

Thus, we do not have an all out assault upon the *entire state scheme of school taxation* predicated upon the inequities resulting from the unequal distribution of property wealth among different school districts as was raised in Serrano v. Priest, 5 Cal.3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241 (1971); Van Dusartz v. Hatfield, 334 F.Supp. 870 (D.Minn., 1971); Rodriguez v. San Antonio Independent School District, 337 F.Supp. 280 (W.D.Texas, 1971). We express no opinion as to what our holding might be under such properly pled contentions.

■■ We are of the opinion that in this state of case now before us the plaintiffs must fail. Miller v. Nunnelley, (Ky.1971), 468 S.W.2d 298, is not conclusive of the issue before this Court as to whether KRS 160.470(2) deprives the plaintiffs of the equal protection of the law to which they are entitled under the Fourteenth Amendment. While the case is conclusive as to the constitutionality of the statute under the Kentucky Constitution, it sets no binding precedent upon us; it is our duty and obligation to determine whether the statute transgresses the Federal Constitution, as to which the Kentucky Court of Appeals decision is to be considered only for such persuasiveness as we find in it, Louisville Gas and Electric Co. v. Coleman, 277 U.S. 32, 48 S.Ct. 423, 72 L.Ed. 770 (1927); Agoston v. Pennsylvania, 340 U.S. 844, 71 S.Ct. 9, 95 L.Ed. 619 (1950), *Cf:* Brown v. Allen, 344 U.

6. See Footnotes 4 and 5, supra.

S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1952).

Likewise, *Miller, supra,* is not res judicata of the issue in this case before us; it did not purport to be a class action, nor did the plaintiffs therein purport to represent citizens, taxpayers, school children, or parents of any school district; none of the parties of *Miller* is before the Court in this litigation. There is no privity between the parties in *Miller* and those in this case. The doctrine of res judicata is not applicable, Blonder-Tongue Laboratories, Inc., v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), and the defendants' reliance upon Battle v. Cherry, 339 F.Supp. 186 (N.D.Ga.1972) is misplaced in this regard.

Plaintiffs herein do not fall within the proscription of 28 U.S.C.A. § 1341, inasmuch as they do not seek to enjoin, suspend, or restrain the assessment, levy or collection of any tax; they seek rather to have declared unconstitutional a statutory limitation on the tax rates which Kentucky's school boards may levy in their school districts. Hargrave v. McKinney, 413 F.2d 320 (5th Cir. 1969).

We now turn to "measure" what offense, if any, this legislation inflicts upon the Fourteenth Amendment. We measure it according to standards heretofore fixed by the Supreme Court and in view of the historical background and the record as to the manner in which the program operates. Askew v. Hargrave, *supra.*

In McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961), it is said:

"The Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

Additionally, no transgression occurs unless the state action is "based on reasons totally unrelated to the pursuit of that goal" and it is enough that the "action be rationally based and free from invidious discrimination." McDonald v. Board of Election Comm., 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739, and Dandridge v. Williams, 397 U.S. 471, 485–487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491. Further, a state has been recognized to have a valid interest in preserving the fiscal integrity of its programs, even to the limiting of them . . . "for public education"; and "mathematical nicety" or some other resultant "inequity" is not fatal. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 and Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369. Also to same general effect, see Metropolis Theater Company v. City of Chicago, 228 U.S. 61, 33 S.Ct. 441, 57 L.Ed. 730.

Tested by these standards we hold the existing legislation to be neither arbitrary, irrelevant to the achievement of the state's objective, nor invidiously discriminatory. The legislation is not administered unevenly, is not based on some hidden motive, and bears a reasonable relationship to the legitimate purpose of preserving the financial integrity of the state.

In Kentucky, state funds provide approximately 52% of all total support for public education and 80% of the funding of the Minimum Foundation Program.[7] Under its Minimum Foundation Program the principle is expressed that the state and local school districts will share

7. The remainder comes from federal funds and private grants.

in the cost of the Program. No more need, we think, be shown to firmly establish the state's interest in the fiscal integrity of the program and the achievements of its objectives.

The required local tax effort is established by the school district, thereby insuring local interest and effort.[8] The resulting sum is the total dollar figure applied to the particular school district.[9] Thus, in determining *need* under the Minimum Foundation Program there is no relation to the wealth of any individual district. No district is penalized because it is poor or because it is rich. All are treated equally as to *need*. Such local effort classification cannot be said by us to be arbitrary.

We are re-enforced in our views by the persuasiveness of the observations of the Kentucky Court of Appeals expressed in its opinion in Miller v. Nunnelley, *supra*, when addressing itself to the problem of the reasonable basis for the legislature's classification it said:

> "The 'Rollback Law' had the purpose and objective of protecting the taxpayers against sudden substantial increases in their tax burdens by action of their elected representatives. The provision of the law freezing the maximum effective rate that the representatives could cause to be levied, within each district, on the basis of each individual district's experience and history, was directly related to the accomplishment of the purpose and objective and was in fact the only method by which full accomplishment could have been achieved. Since the classification made by the legislature [is] on the basis of experience and history [it] thus has a reasonable basis, we cannot say . . . that it denies equal protection."

Likewise, it cannot be said the legislation was local or special legislation simply for the reason that it vested final local taxing authority in the people. We can think of no better place for such vesting than with the folks at home, who, after all, possess the most intimate knowledge of their school problems, needs, and ambitions.

We hold the classification so made by the Kentucky Legislature has a reasonable basis.

Under the law of Kentucky there is a difference between a school board and a school district. A school board is the elected representative of the people in a given school district area, while the school district comprises the citizens within the same area.

The effect of the "Rollback Law" [KRS 160.470(2)] was to freeze the tax rate which any *school board itself* had the power to levy. All such boards were treated equally and there were no exceptions. Additionally, the act *does not freeze* the taxing power of any *school district*, which may still select, by referendum, as high a tax rate as it chooses for local ad valorem taxes without *any penalty for so doing under the Minimum Foundation Program award formula calculation.*[10] Thus, no invidious discrimination.

It is important to note that upon the enactment of the "Rollback Law" [KRS 160.470(2)] no school district lost any revenue; nor did the law, due to its provisions for assessment growth, limit any school district to the same amount in dollars that it had obtained in 1965. In fact, between the years 1965–66 and 1971–72, there was an increase in the contribution by the state to the financing of the Minimum Foundation Program from $127-million to $235-million, approximately 86 per cent. The revenue of all school districts in Kentucky has increased since the enactment of the

---

8. KRS 157.380(3).

9. KRS 157.440(1).

10. In Askew v. Hargrave, *supra*, a penalty was exacted by the state resulting in the cutoff of state funds if local taxes were raised beyond a certain point. No such penalty exists under Kentucky law so local tax rates are not really frozen as they were for all intents and purposes in Florida.

"Rollback Law." [11] There has thus been no "static situation" in Kentucky under the "Rollback" [KRS 160.470(2)]. All school districts are now receiving more money than ever before.

While "dollar-discrepancies" may exist among the counties, such is certainly not conclusive of unequal educational opportunities. Too many factors exist to make the amount of money the sole test or guide. The courts have ruled, further, that the equal protection clause does not demand *perfect equality* in the amount of money spent per pupil among different school districts in a state. McInnis v. Shapiro, (N.D.Ill., 1963) 293 F.Supp. 327; aff'd 394 U.S. 322, 89 S.Ct. 1197, 22 L.Ed.2d 308.

Plaintiffs would make light of the granting by the legislature of the right to a school district by referendum to increase its tax levy, denominating such as a meaningless gesture; however, they cannot escape the fact that since passage of the Act there have been referendums in Kentucky which have been won, whereby school district voters have imposed upon themselves higher rates than those fixed by KRS 160.470(2).

Though while not attacking the Minimum Foundation Program as such in this litigation, the plaintiff alludes to its inequities resulting from variances in local tax effort (assessment) among the various school districts, carrying this forward as its argument for the denial of equal protection under the Fourteenth Amendment. We think it well settled that inequities are not in and of themselves fatal to state legislation, assuming such legislation has withstood the rigors of the tests of invidious discrimination, of being rationally based, related to the pursuit of the goal, and not wholly irrelevant to the achievement of the state's objective. McInnis v. Shapiro; Dandridge v. Williams; McDonald v. Board of Election Commissioners; McGowan v. Maryland; Shapiro v. Thompson; Lindsley v. Natural Carbonic Gas Co.; all *supra*. As to

these tests the Kentucky "Rollback Law" KRS 160.470(2) has prevailed.

Accordingly, the plaintiffs have stated no grounds for relief and this cause is dismissed at the plaintiffs' costs.

So ordered.

---

11. Exhibit II to stipulation.