228 U.S. 61
 33 S.Ct. 441
 57 L.Ed. 730
 METROPOLIS THEATER COMPANY et al., Plffs. in Err.,
v.
CITY OF CHICAGO and Ernest J. Magerstadt.
 No. 181.
 Argued March 12, 1913.
 Decided April 7, 1913.
 
 Bill in equity brought in the circuit court of Cook county, state of Illinois, to restrain the enforcement of a certain ordinance of the city of Chicago, requiring licenses for places of amusement. The ordinance divides the places of amusement into twenty-one classes. The entertainments offered by complainants fall within the first class, which is defined as 'all entertainments of a theatrical, dramatic, vaudeville, variety, or spectacular character.' The license fee is graded according to the price of admission, exclusive of box seats, as follows: If $1 or more, the fee is $1,000; if it exceeds 50 cents, but is less than $1, $400; if it exceeds 30 cents, but is less than 50 cents, $300; if it exceeds 20 cents, but not more than 30 cents, $250; if it does not exceed 20 cents, $200.
 The foundation of the bill is that the ordinance, in so far as it charges an annual license fee of $1,000 upon theaters charging $1 or more for any seat, exclusive of box seats, violates the 14th Amendment of the Constitution of the United States.
 The city filed a demurrer to the bill, which was overruled, and, the city declining to plead further, a decree was entered, enjoining the enforcement of § 104 of the ordinance. The decree was reversed by the supreme court of the state, and the case remanded, with directions to sustain the demurrer and dismiss the bill. This writ of error was then sued out.
 The bill describes the complainants as persons, firms, or corporations, and describes the theaters conducted by each of them as follows: The Colonial theater, capacity 1, 482 seats; McVicker's theater, 1,868 seats; Illinois theater, 1,249 seats; Powers's theater, 1,115 seats; Studebaker theater, 1,350 seats; Cort theater, 962 seats; Grand Opera House, 1,379 seats; Great Northern theater, 1,205 seats; LaSalle theater, 770 seats; Princess theater, 950 seats; Chicago Opera House, 1,434 seats; Olympic theater, 1,532 seats; Garrick theater, 1,259 seats; Whitney Opera House, 708 seats.
 The following are the other pertinent facts: The theaters cannot, under the ordinance, accommodate or grant admission to any number of persons in excess of the number of the seats.
 There have been given and produced at the theaters respectively, excepting in the Cort theater, for more than two years last past, and in the Cort theater for more than two months last past, entertainments and performances of the various kinds described in the ordinance, and in some of the theaters the price of admission has not exceeded $1 and in others it has not exceeded $2. In some the minimum price of admission has been 50 cents, and in some 25 cents. All the theaters, with the exception of one or two, have at different times during the last two years made, and intend in the future to make different maximum and minimum prices of admission, dependent upon the location of seats and according to the cost of production, the season of the year, and condition of business. It is impossible to tell in advance the condition of business or the character of entertainment or the highest or lowest prices of admission. At the present time the highest price to some parts of each of the theaters is $1 or over, and the lowest price is much less. There is not now and never has been any fixed rule or standard among theaters in Chicago as to the number of seats in any theater for which an admission fee of $1 or over is made. In some of the theaters owned and operated by complainants, and in some theaters owned and operated by others, there are more seats sold for more than $1 for a performance, than in others operated by complainants. The gross revenue per performance of complainants' theaters and other theaters, if all of the seats were occupied, would differ and vary according to the seating capacity of the theaters, respectively, and also according to the conditions prevailing, including in the conditions the charge made for admission, and the different prices of admission to different parts of the theaters, there being no theaters in Chicago wherein the prices of admission to all parts of the theater are identical with the prices of admission charged for the same number of seats in any other theater.
 The seating capacity of the largest theater of complainants is 1,868, and of the smallest 708, the gross revenue of the latter being, when fully occupied, less than $1,000, and, of the former not more than $1,500, figured on the basis of existing prices of admission to all parts of the theater. The largest theater or place of amusement in Chicago (the performance being of the kind described in the ordinance, and similar to those given by complainants) has a seating capacity in excess of 4,000, its highest price of admission is $1, and during many weeks of each licensed period its gross revenue is in excess of $4,000; to wit: $5,000. And there are other theaters to which the highest price of admission is less than $1, performances in which are given twice a day, thereby increasing their seating capacity; and the gross and net revenue thereof is more than twice that of some of complainants' theaters. In many other theaters, including those of complainants, charging more than $1 for admission, eight performances only are given per week.
 The complainants pay taxes upon their buildings and personal property, and they have expended in excess of $10,000 for the purpose of producing and giving entertainments of the kind described, and in excess of $5,000 in advertising. The good will and business of complainants are of great value, and if the theaters are not permitted to continue as places of amusement, a large part of the investment of complainants will be destroyed, and they will suffer great and irreparable damage, and in an amount which cannot be adequately ascertained or compensated in an action at law.
 The business of complainants is lawful, and their theaters have been approved by the authorities of the city, and have conformed in every particular to the ordinance of the city.
 On December 17, 1909, an ordinance was passed which the officers of the city threatened to enforce against complainants, whereupon a suit was brought by the latter and others to enjoin the same, upon the grounds, among others, that its provisions were discriminatory. The ordinance in controversy was then passed.
 There are theaters in Chicago other than those of complainants with various seating capacities which, under the ordinance of December 17, 1909, were obliged to pay a license fee of $1,000, but which, under the ordinance in controversy, are required to pay only $400.
 The income obtained by theaters of the second, third, and fourth classes of the amended ordinance is often largely in excess of the income obtained by those of the first class, and there are and for a long time have been given entertainments at which large assemblages of persons congregate and to which no admission fee is charged.
 Complainants intend to give entertainments at their theaters and have refused to pay the license required by the ordinance, and, as such theaters are not impressed with a public use, the city has no right to designate the amount to be charged as admission thereto.
 Many causes of action are threatened against complainants and many of their managers and officers.
 Theaters and places of amusement in Chicago have paid a license fee starting at $100, in 1881, and progressively increasing during certain periods to January 1, 1910, when it was fixed at $500, and complainants paid the license fee exacted during the several periods.
 The inspection and regulation of complainants' theaters do not cost the city more than $50 per year.
 The other provisions of the bill set forth in other ways what is alleged to be the discriminatory character of the ordinance arising from basing the license fee upon the price of admission, and an infringement of the Constitution of the state of Illinois and of the United States is charged.
 Messrs. Alfred S. Austrian and Levy Mayer for plaintiffs in error.
 Messrs. Charles M. Haft and William H. Sexton for defendants in error.
 Statement by Mr. Justice McKenna:
 [Argument of Counsel from pages 65-68 intentionally omitted]
 Mr. Justice McKenna delivered the opinion of the court, after making the above statement:
 
 
 1
 The attack of complainants (we so call plaintiffs in error) is upon the classification of the ordinance. It is contended that the purpose of the ordinance is to raise revenue, and that its classification has no relation to such purpose, and therefore is arbitrarily discriminatory, and thereby offends the 14th Amendment of the Constitution of the United States. The character ascribed to the ordinance by the supreme court of the state is not without uncertainty. But we may assume, as complainants assert, that the court considered the ordinance as a revenue measure only. The court said: 'The ordinance may be sustainable under the taxing power alone, without reference to its reasonableness as a regulatory measure.' And, regarding it as a revenue measure, complainants attack it as unreasonable in basing its classification upon the price of admission of a particular theater, and not upon the revenue derived therefrom; and to exhibit the discrimination which is asserted to result, a comparison is made between the seating capacity of complainants' theaters and the number of their performances within given periods, and the theaters of others in the same respects, and the resulting revenues. But these are accidental circumstances and dependent, as the supreme court of the state said, upon the advantages of the particular theater or choice of its owner, and not determined by the ordinance, It will immediately occur upon the most casual reflection that the distinction the theater itself makes is not artificial, and must have some relation to the success and ultimate profit of its business. In other words, there is natural relation between the price of admission and revenue, some advantage, certainly, that determines the choice. The distinction obtains in every large city of the country. The reason for it must therefore be substantial; and if it be so universal in the practice of the business, it would seem not unreasonable if it be adopted as the basis of governmental action. If the action of government have such a basis it cannot be declared to be so palpably arbitrary as to be repugnant to the 14th Amendment. This is the test of its validity, as we have so many times said. We need not cite the cases. It is enough to say that we have tried, so far as that Amendment is concerned, to declare in words, and the cases illustrate by examples, the wide range which legislation has in classifying its objects. To be able to find fault with a law is not to demonstrate its invalidity. It may seem unjust and oppressive, yet be free from judicial interference. The problems of government are practical ones and may justify, if they do not require, rough accommodations,—illogical, it may be, and unscientific. But even such criticism should not be hastily expressed. What is best is not always discernible; the wisdom of any choice may be disputed or condemned. Mere errors of government are not subject to our judicial review. It is only its palpably arbitrary exercises which can be declared void under the 14 Amendment; and such judgment cannot be pronounced of the ordinance in controversy. Quong Wing v. Kirkendall, 223 U. S. 59, 56 L. ed. 350, 32 Sup. Ct. Rep. 192.
 
 
 2
 Judgment affirmed.