Richard **BARNETT**, et al., **Plaintiffs**,

v.

**CITY OF CHICAGO**, et al., **Defendants**,

and

Carole **Bialczak**, et al., **Defendant–Intervenors.**

**Nos. 92 C 1683, 92 C 2104 and 92 C 2666.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 7, 1998.

Judson H. Miner, Miner Barnhill & Galland, Chicago, IL, Nathaniel R. Howse, Jr., Howse, Howse, Neville & Gray, Chicago, IL, R. Eugene Pincham, Chicago, IL, Jacqueline A. Berrien, New York, NY, Philander Scott Neville, Jr., Chicago, IL, for Plaintiffs.

James Michael Scanlon, James M. Scanlon & Associates, Chicago, IL, for Defendant Bd. of Elections of City of Chicago.

Margaret E. Rice, City of Chicago, Department of Law, Chicago, IL, for Defendant City of Chicago.

Jorge Sanchez, Chicago, IL, Patricia Mendoza, Chicago, IL, for Intervenor defendants Neomi Hernandez, Ignacio Alvarez.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

On April 1, 1998, the Seventh Circuit Court of Appeals issued its opinion affirming in part and vacating in part the opinion of Judge Duff following trial of this case. *Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir.1998). On May 12, 1998 this case was reassigned to me for further proceedings consistent with the direction of the Court of Appeals.

In its decision, the Seventh Circuit held that in terms of citizen voting-age population and proportional voting power, African Americans are underrepresented in the existing City aldermanic map by one ward. The Court noted that one of the maps introduced by the plaintiffs would achieve proportional equality but that the record did not provide a sufficient basis for determining whether deviations from proportionality were justified by other considerations. The Court concluded that further proceedings therefore were needed to determine whether the City of Chicago's 1992 aldermanic map violates the voting rights of African American residents

of the City under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(b).

In this court the parties have raised various issues. Defendants moved to dismiss on the ground that the population of Chicago has changed so much since 1990 that plaintiffs effectively now are a majority in at least 20 wards. I rejected defendants' attempts to produce such evidence on the ground that the Seventh Circuit has stated that the census data is "the relevant data for assessing a claim under Section Two." *Dickinson v. Indiana State Election Bd.*, 933 F.2d 497, 502 (7th Cir.1991).[1] Indeed, the Seventh Circuit relied on 1990 census data in its opinion in this case and did not indicate that any new evidence with respect to this subject was to be considered on remand.

Following my order that further proceedings were to concentrate on the map referred to by the Court of Appeals, defendants also moved to decertify the class on the ground that none of the named plaintiffs live in the wards that would be affected by that map. That motion was denied because plaintiffs' claim is a citywide claim and is not limited to particular wards. It has been so viewed in two opinions by the Seventh Circuit. *Barnett v. City of Chicago*, 141 F.3d at 703–06; *Barnett v. Daley*, 32 F.3d 1196, 1202 (7th Cir.1994). Thus, although the focus of the present proceeding has been on one part of the city, the claim continues to be one for citywide dilution of African American voting rights. Accordingly, the named plaintiffs have standing. Alternatively, I granted plaintiffs' motion to add additional plaintiffs who do live in the wards affected by the proposed map.

■ After considering legal and factual memoranda submitted by the parties with respect to the maps submitted by the plaintiffs,[2] I held an evidentiary hearing, on August 3 through 5, 1998, limited to the issue of topographical, cultural, and economic factors that may affect communities of political interest.[3] This opinion constitutes my findings of fact and conclusions of law.

Maps 2 and 19 (as they have been referred to in the proceeding before me), would provide proportional representation to African Americans in creating 20 wards in which African Americans would constitute at least 65 percent of the total population. That is not the only criterion in determining whether defendants have violated the Voting Rights Act. The statute requires me to consider "the totality of the circumstances," which the Seventh Circuit defines as a consideration of such factors as "the compactness of districts and the desirability of preserving continuity and recognizing topographical, cultural, and economic factors that may make one ward mapping preserve communities of political interest better than another." 141 F.3d at 705. Each of these factors will be considered.[4]

■ The first factor is compactness. The test is whether the proposed wards are, at worst, "merely irregular" in shape as opposed to "grotesque." *Id.* Maps 2 and 19 both focus on the southwest corner of the City. Both would move portions of the population from ward 18 to wards 13 and 19, move others from 13 to 18, still others from ward 21 to 18, and move the line of ward 21 west to take in part of the population of ward 19. Map 19 is nearly identical but makes some changes apparently in response to earlier

1. For this reason I also rejected attempts to place in evidence projected data about changes in population since 1990.

2. Initially, neither party was able to identify the map referred to in the Seventh Circuit opinion. Eventually, plaintiffs identified two maps that met the criteria of creating 23 white wards, 20 black wards and seven Latino wards. Plaintiffs sought to introduce additional maps. I concluded that while the Court of Appeals had not explicitly stated that plaintiffs were limited to these maps on remand, the length of the prior proceedings and the Court of Appeals' reasonable insis-

tence that this case be concluded quickly necessitated this limitation.

3 **While the parties disagreed about other issues, this was the only area in which there was a factual dispute on the issues before me.**

4. In their briefs, defendants argued that because plaintiffs' map drawers did not consider these factors, plaintiffs could not meet their burden of proof. At closing argument, defendants conceded that the test is whether the maps as drawn satisfy plaintiffs' burden under the Voting Rights Act.

criticisms of plaintiffs' map 2. Neither map creates wards that are grotesque in shape. The most irregular part of the two maps is a panhandle added to ward 19, resulting from moving portions of ward 18 to ward 19, which addition, while connected to the northern portion of existing ward 19 also borders on the suburb of Evergreen Park. Not only is the addition not "grotesque" in shape, however, but it is also no more irregular than many wards in the existing ward map drawn by the City. *See*, for example, wards 2, 3, 21, 27 and 30. Where a proposed map contains districts that are of similar compactness to those in a challenged map, compactness ordinarily is not a consideration. *Houston v. Lafayette County, Miss.*, 56 F.3d 606, 611 (5th Cir. 1995). Particularly since I do not find plaintiffs' proposed changes in wards to be any more irregular than ordinary ward configurations, I conclude that in terms of compactness, plaintiffs' map is comparable to the City's map.

The second factor to be considered in comparing a more proportional map in terms of representation with the City's map is the "desirability of preserving continuity." *Barnett*, 141 F.3d at 705. Plaintiffs' maps would move portions of the population that for many years have been in wards 13, 18 and 19 to other wards. The City, however, had also changed the boundaries of these wards, placing part of the population of each in new wards in the existing map.[5] Furthermore, every one of the 50 wards in Chicago was changed somewhat, some bearing essentially no resemblance to their prior boundaries. Judge Duff found that the City's map resulted in "significant changes in traditional ward boundaries." *Barnett v. City of Chicago*, 969

F.Supp. 1359, 1398 (N.D.Ill.1997). In terms of percentages, plaintiffs' maps do not move more of the population than were moved by the City's map.[6] In addition, defendants' own map drawer testified at the trial before Judge Duff that in at least one case part of the population of one ward was moved to another (ward 21) simply because an alderman wanted to be rid of the area. Defendants argue that plaintiffs have provided no explanation for the population changes made by plaintiffs' maps, and say the only reasonable explanation for drawing ward 18 to exclude the current alderman is to prevent his reelection. With respect to the current alderman, I find no evidence that plaintiffs intentionally drew a line to exclude him from representing the 18th ward. It is undisputed that his residence is on the far southwest corner of ward 18, and if plaintiffs were going to draw an 18th ward that brought in additional African American population from the east, it was logical to draw a boundary that excluded the far western part of the ward, in which Alderman Murphy's residence is located. Accordingly, the fact that the result of creating an additional African American ward is to move people from one ward to another is not itself significant in this case.

The third relevant factor that must be considered is communities of political interest. *Prosser v. Elections Board*, 793 F.Supp. 859 (W.D.Wis.1992) (three-judge court), explained that a district should generally share "a reasonable homogeneity of needs and interests" such that its representative can represent all of his or her constituents. *Id.* at 863.[7] Much of the argument in this court

---

5. As the defendants' own exhibit 12 to its response to plaintiffs' brief regarding Barnett Plaintiffs' exhibits 39 and 56 show, the boundaries of each ward, and particularly ward 18, had changed over the years.

6. The parties' exhibits show that in drawing the existing map, the population retained in wards ranged from a low of only six percent to nearly 100 percent in ward 18. See plaintiffs' exhibit DD, Ex. 7. More specifically, in the present ward map, in 11 wards, defendants retained less than 50 percent of the population, in half the wards defendants retained less than 80 percent population, and in 42 of the 50 wards, defendants retained less than 90 percent of the preexisting

population. In contrast, plaintiffs' changes would retain from 82 to 99 percent of the population in all but the 18th ward, in which the retention is 68 or 66 percent, depending on the map.

7. Defendants cite somewhat different language from various other cases but as they conclude, the meaning is the same: constituents ideally will have similar needs and interests in areas in which their elected official represents them. The ideal can never be met perfectly since even in a constituency of a single family, as testimony at the hearing showed, there may be differences of opinion.

has centered on the degree to which constituents can differ in social-economic circumstances and still have reasonable homogeneity.

Various experts, aldermen, community representatives and residents testified regarding the community interests of residents of the 18th, 19th and 21st wards in Chicago.[8] Although the aldermen (Rugai and DeVille) for the 19th and 21st wards testified that they would have difficulty representing the constituents that plaintiffs' proposed maps would place in their wards, I did not find this testimony credible. Alderman Rugai's testimony with respect to the proposed addition of mostly white residents from the 18th ward was not believable. From all the evidence presented, they share the same interests and economic status as most of the residents of the 19th ward.[9] Neither do I credit the argument that because they live on what would be a panhandle to the rest of the ward that it would ·impair their interests. The area is separated by a forest preserve but that kind of separation is common to other areas of the city that have been placed together in existing wards. *See,* for example wards 5, 9, 36. Indeed, the Mt. Greenwood section of the current ward 19 is similarly separated from the rest of ward 19 by a cemetery and country club.[10] There was no evidence that their interests are in any way impaired by this separation.

Defendants vigorously argue that cultural and economic differences between persons now in the eastern part of ward 19 who would be moved to ward 21 by plaintiffs' maps and the majority of residents of ward 21 create a divergence of political interests that when balanced with other factors, outweigh the gains of proportionality. The eastern part of the 19th ward, and the area affected by the proposed maps, is the Beverly–Morgan Park area of Chicago. The area is a recognized neighborhood in the City, characterized by a cohesive, active community, an historic district, neighborhood and business associations, and racial integration. Various residents as well as community leaders testified that if 8500 residents (about 20 percent of the total population of the neighborhood) are placed in another ward, the character of the neighborhood (including integration) will be threatened.

In response, plaintiffs point out that the City map itself displaced some 1400 Beverly–Morgan Park residents into either the 21st or 34th ward without serious consequence to the neighborhood or the ability of the community as a whole to protect its interests. This is, of course, a less significant number.

Plaintiffs also refer to the division of wards in Hyde Park–Kenwood to demonstrate that the character of a community is not defined by political wards. Defendants counter that Hyde Park is different because it includes the University of Chicago, which experts agree has exerted a powerful influence on the .Hyde Park–Kenwood community. They say Beverly–Morgan Park is more vulnerable because it has no comparable institution.

---

**8.** In setting the evidentiary hearing in this case, I said that I did not want to hear evidence with respect to religion or schools as setting a community of interest. My reason for doing so was that as is generally known in Chicago neither school attendance or parish lines have any correspondence with ward lines. Defendants' declarations and testimony nevertheless referred to this issue and they note that various cases state that these factors may be relevant in determining a community of interest. I have considered the evidence but reach the same conclusion. No reliable evidence indicates that changing any ward boundary will have any effect on school attendance, school boundaries, parish boundaries or in any way connected to either of these factors affect a community of political interest.

**9.** Alderman Murphy also testified that placement of parts of ward 18 into wards 13 and 19 would result in "uncertainty," "confusion," and "instability." Again, I found no credible evidence to support this assertion. Every time a ward line is changed, residents have to deal with new aldermen on issues on which a ward boundary defines services. Given the fact that all ward boundaries are regularly changed, there would be some concrete evidence that this would cause serious problems if it existed.

**10.** None of defendants' remaining arguments with regard to topographical features deserve comment. For instance, defendants appear to argue that the I–57 highway is a natural barrier. But defendants' map leaves a short area west of I–57 in a ward together with area east of I–57. Plaintiffs' proposed maps would move the boundary farther west, thus having no effect on an alleged natural boundary that defendants had at any rate ignored.

While the Hyde Park–Kenwood community does have significant differences, Professor Richard Barrett's evidence indicates that historically neighborhoods in Chicago have been divided among multiple wards.

Statistics do not support defendants' claims that the economic or cultural values of persons displaced into the 21st ward from the 19th ward and existing residents of the 21st ward differ to a marked degree. The vast majority of residents of the 21st ward, like those in the affected area of the 19th ward, own their homes and most show median family incomes that do not differ significantly from most of the residents that would be placed in the 21st ward by plaintiffs' map. Defendants point to the fact that the census track for one group of people in current ward 19 that would go to ward 21 shows a high median family income of $66,134 in comparison with median family incomes in the existing 21st ward with averages in the $30,000 to $40,000 range. As Professor Richard Barrett, one of plaintiffs' experts points out, however, other wards in the city show much greater ranges in income. There is simply no evidence in this record to support the argument that the differences in income noted by defendants create a divergence of cultural or economic interests that would prevent an alderman from representing both constituencies.

I am similarly unpersuaded by the fears of various witnesses that the displacement of a portion of the Beverly–Morgan Park area into another aldermanic ward will result in the destruction of the community. The fact that residents are split between two wards will not prevent the same community organizations that exist now from continuing to represent the same neighborhood. While the alderman will not represent quite as many neighborhood residents, she will represent nearly 80 percent of the existing neighborhood constituency and will have the same reasons as before to be responsive to their interests and needs. There was testimony that potential community projects could be affected in terms of the need for aldermanic approval of land use. The only ones mentioned appeared to be within a block or two of the boundary of plaintiffs' proposed map 2. The simplest remedy would be to take such area into account in drawing a final map. Beyond that, however, while there necessarily is always the potential that a block of land subject to aldermanic approval and that affects interests of residents in more than one ward will meet with conflicting opinions by different aldermen, no boundary line will remove that possibility.[11]

Various residents who would be taken out of the 19th ward and placed in the 21st ward testified that they were concerned either that their streets would no longer be kept clean, abandoned cars would not be removed, and zoning laws would not be enforced. They were further concerned that a ban on liquor in their community would be changed. The ban on liquor, it was agreed, could be changed only if the precinct they lived in voted for a change. There is nothing in the ward boundary line that would affect this decision. The remaining concerns have more to do with perceptions about the quality of the alderman than ward boundaries.[12] Concern about services that to which each Chicagoan is entitled is not a factor that creates a separate community of interest.

■ Defendants finally argue that dividing the Beverly community by race will send a message that promotes segregation and will lead to destruction of the present integration and make the African American residents who are displaced into the 21st ward feel

11. The current alderman of the 21st ward, Alderman DeVille, testified that his primary concern was jobs, a concern that defendants insist is incompatible with the goals of 19th ward constituents. Apart from the fact that in general I did not find Alderman DeVille to be a credible witness (he implied, for example, at one point that jobs for ward residents at a new Home Depot store depended on which ward they lived in, a statement that could only be true if a politician were exerting improper pressure on the private employer), there was no concrete evidence that Alderman DeVille's priorities would prevent him from adequately representing the area proposed to be added to his existing ward.

12. The alderman of the 21st ward is newly appointed. From the testimony, the aldermen of the 18th and 19th wards have been effective in responding to matters of concern to the residents of those wards.

inferior. In the first place, of course, this suit was brought by African American residents of the City of Chicago who are complaining that their voting rights are impaired because they are unable to elect their proportionate share of African American aldermen. The point of plaintiffs' map is to create an additional ward in which there will be a sufficient majority of African Americans that they can elect one additional alderman of their choice. While there may be individuals who nevertheless feel the way defendants say they will, courts cannot take that possibility into account in determining whether plaintiffs' voting rights have been violated. *Gingles v. Edmisten*, 590 F.Supp. 345, 356 (E.D.N.C.1984), *aff'd in part and rev'd in part on other grounds, sub nom. Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *Accord, Brown v. Board of Commissioners of Chattanooga*, 722 F.Supp. 380, 397 (E.D.Tenn.1989) (noting that Congress was aware of this issue and determined that it was outweighed by the need to secure minority voting rights). Defendants' argument that plaintiffs' line may somehow lead to "white flight" may not be considered for similar reasons.

Having heard the evidence with respect to communities of political interest and considered the undisputed evidence on the remaining issues that I am to consider in examining the totality of circumstances, I conclude that plaintiffs' proposed alternative maps 2 and 19 do not "trampl[e] on any values that deserve weight in redistricting." *Barnett v. City of Chicago*, 141 F.3d at 705. Accordingly, since these maps create wards that meet the proportional population standards found to be appropriate by the Seventh Circuit in this case, they better balance the relevant factors than does the existing map. Based on the totality of circumstances, plaintiffs have shown a violation of Section 2 of the Voting Rights Act. 42 U.S.C. § 1973(b).

■ Ordinarily when there has been a violation of the Voting Rights Act, courts should give the legislative body an opportunity to reapportion. *See McDaniel v. Sanchez*, 452 U.S. 130, 149 n. 30, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981); *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411

(1978). If the legislative body refuses to act or the imminence of an election makes this impractical a court can devise a plan. In this case an election is set for early next year but the Court of Appeals has ruled that time must be allowed for any appeal of this court's decision. The defendants have stated that they can reapportion the City's ward map in three days. Accordingly, defendants are given until 4:00 p.m. on August 12, 1998 to submit a map that complies with this opinion. Status is set for August 13, 1998 at 9:15 a.m. If the City fails to submit an appropriate plan, judgment will be entered at that time on map 2 (with any changes agreed to by the parties).