In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-2755 & 04-4009

ED H. SMITH, ALLAN STREETER,
DOROTHY TILLMAN, et al.,

*Plaintiffs-Appellees,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94 C 920—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED SEPTEMBER 27, 2005—DECIDED AUGUST 7, 2006

Before FLAUM, *Chief Judge*, and BAUER and SYKES,
*Circuit Judges*.

SYKES, *Circuit Judge.* This case is satellite litigation
emanating from the long-running legal battle over the
remapping of Chicago's aldermanic wards following the
1990 census. Though it presents only a claim for
unreimbursed attorneys' fees and related litigation ex-
penses, it is dressed up in constitutional clothing. The
plaintiffs are Chicago aldermen who challenged the City's
ward map in court and then claimed that the City's refusal
to finance their legal expenses in that litigation violated
their equal protection and free speech rights.

Illinois law requires the City Council to redraw Chicago's
aldermanic ward boundaries after each national census.

The City's attempt to create a new ward map after the 1990 census generated more than its share of federal litigation. Chicago's aldermen were divided (with a few exceptions) into two opposing camps during the political struggle over the new ward boundaries—the "Administration Aldermen," aligned with Mayor Richard M. Daley, and the "Opposition Aldermen." When the two sides could not agree, their competing ward maps were submitted to Chicago's voters via referendum as required by state law. The map proposed by the Administration Aldermen was adopted by voters and became law.

The new map was challenged in several federal lawsuits, and the two aldermanic factions lined up against each other in the consolidated litigation. As the case progressed, the City Council authorized payment of the litigation-related attorneys' fees and expenses of the Administration Aldermen who intervened to defend the map but not the Opposition Aldermen who sued to invalidate it. This decision spawned the present lawsuit, in which the Opposition Aldermen argued that this unequal treatment in the payment of attorneys' fees was unconstitutional. The suit remained pending while the redistricting litigation proceeded to trial, appeal, remand for limited retrial, and ultimately settlement. The Opposition Aldermen partially prevailed and were awarded some $8 million in attorneys' fees under the fee-shifting provisions of the Voting Rights Act, 42 U.S.C. §§ 1988 and 1973$l$(e).

About $250,000 in litigation expenses, however, were not included in the fee award, and those remaining unpaid expenses are at issue in this action. The district court granted summary judgment for the City on the free speech claim. Following a bench trial on the equal protection claim, the court concluded that the City's decision to pay the litigation expenses of the aldermen who defended the City's remap ordinance in court but not those who challenged it failed the rational-basis test. The court was strongly

influenced by an earlier decision of the City Council to pay the litigation expenses of aldermen who sued the former mayor in an unrelated set of lawsuits stemming from the "Council Wars" of the mid-1980s. This, the court said, required the City "live with [its] decisions and treat other plaintiff-aldermen in like fashion." The court awarded the Opposition Aldermen their unreimbursed legal expenses plus prejudgment interest.

We reverse. No fundamental right or suspect classification is implicated here, so the City's action is reviewed only for a rational relationship to a legitimate governmental interest. This is a lenient standard, but the district court failed to treat it as such. Defending the City's ordinances against legal challenge is unquestionably a legitimate municipal interest, and it was entirely rational for the City to pay the litigation expenses of the aldermen who intervened on the City's side in defense of the duly adopted ward map but not those of the aldermen who sued to invalidate it. That the City Council authorized payment of legal expenses for certain other plaintiff-aldermen in unrelated litigation years earlier does not obligate the City to finance all subsequent aldermanic litigation against it—by operation of the Equal Protection Clause or any other principle. The City is thus not required to "live with" its prior decisions in the sense suggested by the district court.

The free speech clause of the First Amendment does not provide an alternative basis upon which to uphold the judgment. The government's decision not to subsidize the exercise of a constitutional right does not infringe the right. This case does not involve viewpoint discrimination within a government-sponsored speech forum or a generalized subsidy program for private litigation. The City's decision not to underwrite the Opposition Aldermen's legal challenge to the ward map did not violate their free speech rights.

**I. Background**

Illinois law provides that if the Chicago City Council fails to pass a redistricting ordinance in the year that a national census is conducted, proposed ordinances supported by at least one-fifth of the aldermen may be submitted to the electorate for a referendum vote. *See* 65 ILCS 20/21-38, 20/21-40 (2002). A referendum vote became necessary in the remapping process that followed the 1990 census when the so-called Administration Aldermen and Opposition Aldermen could not reach consensus on a new aldermanic ward map. On March 17, 1992, the voters of Chicago approved the ward map submitted by the Administration Aldermen, and this map consequently achieved the status of a City ordinance.

Three lawsuits challenging the validity of the redistricting ordinance followed closely on the heels of the referendum. In the first, *Barnett v. Daley*, nine voters alleged that the map violated the Voting Rights Act; they named all 50 aldermen as defendants in the suit. The 50 aldermen were dismissed as defendants at an early stage of the *Barnett* litigation. The second suit, also alleging violations of the Voting Rights Act, was brought by the Opposition Aldermen. In this case, *Smith v. Daley*, no aldermen were named as defendants. The third suit, *Bonilla v. City Council*, was brought by Latino voters and also did not name any aldermen as defendants. The Administration Aldermen were permitted to intervene as defendants in all three cases for purposes of defending the remap ordinance, and they retained private legal counsel to represent them. The Opposition Aldermen also retained private counsel for purposes of pursuing their claims as the plaintiffs in *Smith*. The City of Chicago and the mayor, also defendants in the three cases, were represented by the office of the City Corporation Counsel.

The three cases were consolidated for a 48-day bench trial, and the district court entered judgment for the

defendants on all claims. *See Barnett v. City of Chi.*, 969 F. Supp. 1359 (N.D. Ill. 1997). On appeal, this court affirmed the judgment in *Bonilla* but, for reasons not relevant here, vacated the judgments in *Barnett* and *Smith* and remanded with directions for a limited retrial. *Barnett v. City of Chi.*, 141 F.3d 699, 706 (7th Cir. 1998). On remand, the district court held that the Voting Rights Act required a modification to the ward map ordinance to incorporate an additional supermajority African-American ward, and the parties entered into a consent decree modifying the ordinance in conformity with the district court's decision. *See Barnett v. City of Chi.*, 17 F. Supp. 2d 753 (N.D. Ill. 1998). The district court ultimately awarded more than $8 million in attorneys' fees to the plaintiffs in the *Barnett* and *Smith* cases as prevailing parties pursuant to the fee-shifting provisions applicable to successful claims under the Voting Rights Act, 42 U.S.C. §§ 1988 and 1973*l*(e). *See Barnett v. City of Chi.*, 122 F. Supp. 2d 915 (N.D. Ill. 2000), *aff'd* 3 F. App'x 547 (7th Cir. 2001).[1] The district court's award of fees did not include $246,354.07 (primarily expert witness fees) that were incurred by the Opposition Aldermen but were not recoverable under the Voting Rights Act or other provisions. This amount is the subject matter of the present case.

As the redistricting litigation made its way through the federal courts for nearly a decade, the City paid the attorneys' fees incurred by the Administration Aldermen. The Opposition Aldermen's request for payment of attorneys' fees, however, was denied. Specifically, on February 12, 1993, Opposition Alderman Lawrence Bloom wrote to

---

[1] The fee award was initially $5 million; before the district court in the present case, the parties stipulated that this amount was increased by supplemental orders of the district court in *Smith/Barnett*.

Administration Alderman Edward Burke, in Burke's capacity as chairman of the City Council's Committee on Finance, requesting payment of legal fees on behalf of the Opposition Aldermen. Alderman Burke denied the request, citing a provision in the Chicago Municipal Code governing payment of City officials' attorneys' fees:

> In my opinion there is no basis in the Municipal Code of the City of Chicago to authorize payment of [your] legal fees. Section 2-152-170 of the Municipal Code authorizes the payment of legal fees for City officials when the action has been brought against them for activities performed in the course of their employment. This Section does not authorize the payment of legal fees for those persons bringing the action. . . . If you believe that there is any legal authority pursuant to which the City of Chicago may pay [your] legal fees I would welcome you to share this authority with me.

Alderman Burke reiterated his position in a second letter to Alderman Bloom:

> [S]ection 2-152-170 of the Municipal Ordinances authorizes the City of Chicago to appoint outside counsel to defend an official or employee in an action or claim brought against the employee or official. It is clear that [your lawyer] is acting as the lead plaintiffs' attorney in this litigation. I have not found any language in the Municipal Code to authorize the Committee on Finance to pay the fees of outside lawyers hired to sue the City of Chicago, its officials and employees.

In February 1994, the Opposition Aldermen filed this action against the City of Chicago alleging that the City's refusal to pay their attorneys' fees while simultaneously paying the fees incurred by the Administration Aldermen violated their free speech and equal protection rights under the First and Fourteenth Amendments. The suit remained

pending for the next eight years until the underlying redistricting litigation reached its conclusion in 2001. In January 2002, the City moved for summary judgment, and the district court dismissed the free speech claim but preserved the equal protection claim for trial. Following an eight-day bench trial, the district court held that (1) the Opposition Aldermen had been "treated differently because of their membership in a group that opposed the Referendum Map espoused by the [C]ity," (2) "the City applied § 2-172-170 [the attorneys' fees ordinance] unequally with respect to Plaintiffs," and (3) the City lacked a rational basis for this difference in treatment. The court entered judgment in favor of the Opposition Aldermen in the amount of their previously unreimbursed litigation expenses, $246,354.07, plus an additional $168,956.24 in prejudgment interest.

In reaching these conclusions, the district court relied heavily on the fact that the City had, in unrelated litigation predating the present dispute by nearly a decade, paid the legal expenses of a group of aldermen (including Alderman Burke) who sued Mayor Harold Washington and other city officials during the turbulent "Council Wars" that followed Washington's election in 1983. *See Roti v. Washington*, 450 N.E.2d 465 (Ill. App. 1983) *("Roti I")*; *Roti v. Washington*, 500 N.E.2d 463 (Ill. App. 1986) ("*Roti II*"). The *Roti* cases arose out of a power struggle for control of the City Council and tested the validity of certain resolutions adopted by competing aldermanic factions regarding the organization and operation of the Council. The City assumed payment of attorneys' fees for both sides in the *Roti* cases—including Alderman Burke's group, which had initiated the suits. Burke, as chairman of the Finance Committee, authorized the payment.

The district court held that given the City's action in the *Roti* cases, its reason for denying attorneys' fees to the

Opposition Aldermen in the redistricting case—that it would not authorize payment of attorneys' fees for officials who sued the City—was "unavailing" as a rational basis. The court declared that the City "must now live with" its prior decisions and "treat other plaintiff-aldermen in like fashion."

## II. Discussion

### A. Equal Protection

We note at the outset that the equal protection claim in this case suffers from a good deal of conceptual confusion; the precise contours of the claim are at best fuzzy. The district court held that the City, acting through Alderman Burke, applied the attorneys' fees ordinance in a discriminatory manner in denying the Opposition Aldermen's request for attorneys' fees. The ordinance in question, Chicago Municipal Code § 2-152-170, authorizes payment of attorneys' fees for City officials and employees when claims or actions are brought against them for their on-the-job conduct. More specifically, § 2-152-170 provides, in pertinent part:

> If any claim or action . . . is instituted against a current or former elected official, current or former appointed official or current or former employee of the city of Chicago . . . where such claim arises out of any act or omission, made in good faith, occurring within the scope of such person's office or employment, the chairman of the committee on finance of the city council, with the approval and concurrence of the mayor, may at the request of such person appoint counsel to defend such person against any such claim or action.

On appeal, the Opposition Aldermen describe their equal protection claim—and the district court's holding—more broadly than the district court apparently viewed

it. They characterize their claim as a challenge to the City's discriminatory application of its "funding ordinances" in denying their request for attorneys' fees in the redistricting litigation. At oral argument, we asked counsel for the Opposition Aldermen to identify which other "funding ordinances"—beyond § 2-152-170—were at issue here; he responded that Alderman Burke "wasn't limited to [§] 2-152-170," but was not more specific. Following argument, counsel moved "To Clarify or to Correct Statements Made at Oral Argument" and identified certain numerical line items in the City's 1995 Annual Appropriations Ordinance as the source of Alderman Burke's authority to pay attorneys' fees claims of city officials.

This broader characterization of the equal protection claim appears to be on somewhat better footing than the district court's. The language of the attorneys' fees ordinance plainly does *not* authorize payment of attorneys' fees for officials who sue the City. The ordinance by its terms is limited to payment of attorneys' fees for City officials or employees in claims "instituted against" them for their job-related conduct. A strictly literal reading of this language also appears to exclude payment of the Administration Aldermen's attorneys' fees in the redistricting litigation, as they intervened as defendants. It plausibly could be argued that the ordinance, broadly construed, would allow payment of the Administration Aldermen's attorneys' fees; as defendant-intervenors, they were aligned with the City officials against whom the redistricting claims were originally instituted. But even the most expansive interpretation of § 2-152-170 would not encompass claims "instituted by" elected officials against the City or its officers, and that necessarily excludes the Opposition Aldermen's request for attorneys' fees from the scope of the ordinance.

The ordinance on its face thus classifies City officials and employees in a way that discriminates against the Opposition Aldermen: officials and employees who are sued in their official capacities get their attorneys' fees paid, but

officials and employees who sue the City do not. But the Opposition Aldermen have specifically disavowed any facial constitutional challenge to § 2-152-170; they have characterized their claim as an "as applied" challenge to the City's unequal enforcement of its "funding ordinances," presumably including § 2-152-170. The district court treated the actual terms of § 2-152-170 as unimportant for purposes of equal protection analysis: "Regardless of the ordinance's 'proper' interpretation," the court said, "the City, which voluntarily chose to reimburse the *Roti* aldermen notwithstanding their status as plaintiffs . . . must now live with those decisions and treat other plaintiff-aldermen in like fashion."

We cannot agree. First, the proper interpretation of a statute is hardly irrelevant to a determination of the statute's constitutionality, either on its face or as applied. "There can be little doubt that [the question of] whether a statute is constitutional fairly includes the question of what the statute says." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 126 S. Ct. 1297, 1305 (2006). Second, a prior misapplication of the ordinance—if that's what occurred in the *Roti* cases—does not estop the City from applying it correctly in a subsequent case. The Equal Protection Clause does not entitle the Opposition Aldermen to a misinterpretation of the ordinance. Because § 2-152-170 does not authorize payment of their attorneys' fees, the district court's conclusion that the City applied the ordinance "unequally with respect to Plaintiffs" is legally untenable. So there must be some other basis for the equal protection claim apart from an "as applied" challenge to the attorneys' fees ordinance.

The alternative conceptualization of the claim offered up by the Opposition Aldermen has its own deficiencies. In their brief they argued that the district court "correctly found" the City had no rational basis for its "inconsistent application of its funding ordinances"—apparently not just

§ 2-152-170 but other, unspecified funding ordinances as well. This overstates the district court's holding, at least as the court purported to limit it. In a footnote to the Memorandum Opinion and Order filed following the bench trial, the court specifically noted that although the "[p]laintiffs have offered some evidence that the City paid the legal expenses . . . from sources besides § 2-172-150," the court was confining its analysis to § 2-152-170. At the same time, however, the district court's opinion assumes the existence of authority to pay aldermen's attorneys' fees apart from that conferred by § 2-152-170; that much is implicit in the court's holding that the City had no rational basis to deny the Opposition Aldermen's request for fees while granting the requests of other aldermen who would arguably be excluded from the scope of the ordinance. Also, the opinion variously uses the plural "fee payment ordinances" or generically, "ordinances." Given the internal confusion, we will give the district court's holding the broader interpretation the Opposition Aldermen ascribe to it.

The Opposition Aldermen did not identify—in their brief anyway—the other "funding ordinances" they claim the City inconsistently applied. As we have noted, after oral argument counsel identified the 1995 Annual Appropriations Ordinance as the other "funding ordinance" at issue in the case. Although the district court did not rely on it, it is in the record. The specific line items counsel identifies appear to be general funds restricted only by the following language: "for legal, technical, medical and professional services . . . to be expended at the direction of the chairman of the committee on finance." It appears we are being asked to assume that the other Annual Appropriations Ordinances covering the nine-year duration of the redistricting litigation contain similar line items and language. (We note as an aside that this court has previously described the extreme "protraction" of the redistricting litigation as "absurd." *Barnett*, 141 F.3d at 706.)

As best we can understand it, then, the equal protection violation at issue in this case can be summarized as follows: Without regard to § 2-152-170, the Finance Chairman has discretion to pay, from a generally unrestricted legal and professional services fund in the Annual Appropriations Ordinance, the litigation-related attorneys' fees incurred by City officials; Alderman Burke exercised that discretion in a discriminatory fashion in disallowing the Opposition Aldermen's request for payment of attorneys' fees while authorizing payment of the Administration Aldermen's attorneys' fees; there is no rational basis for the discriminatory treatment. With that recapitulation of the claim, we proceed at last to the issues on appeal.[2]

The purpose of the Equal Protection Clause of the Fourteenth Amendment is to "secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) *(*quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923)); *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 713-14 (7th Cir. 2002). Where (as here) no fundamental right or suspect classification is at issue, equal protection claims are evaluated under the rational-basis standard of review.

---

[2] Responsibility for the conceptual confusion in this case rests squarely with the Opposition Aldermen, who as plaintiffs had the burden of proof. Given the lack of clarity in their articulation of the fundamentals of their equal protection claim, the internal confusion in the district court's opinion is perhaps understandable. On appeal, the City has not challenged the district court's factual findings but raises only legal error in the application of rational-basis review. We review legal issues de novo, and that has required us to reset the claim in the proper conceptual framework.

*Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003); *Martin*, 295 F.3d at 712; *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007-08 (7th Cir. 2000). To prevail, a plaintiff must prove the following: (1) the defendant intentionally treated him differently from others similarly situated, (2) the defendant intentionally treated him differently because of his membership in the class to which he belonged, and (3) the difference in treatment was not rationally related to a legitimate state interest. *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 950-51 (7th Cir. 2002); *Discovery House*, 319 F.3d at 282.

The district court held that the Opposition Aldermen satisfied all three elements of this test. More specifically, the court held that the City discriminated against the Opposition Aldermen in their request for payment of attorneys' fees in the redistricting litigation "because of their membership in a group that opposed the Referendum Map espoused by the City" and that there was no rational basis for the discriminatory treatment. On appeal, the City concedes the first two elements and focuses its argument on the district court's application of the rational-basis test.

We pause here to note that in the district court, the parties vigorously disputed how the rational-basis test should be applied where the equal protection claim is not a facial attack on a statute but, rather, an "as applied" challenge, or more accurately here, a challenge to a decision of a government official acting pursuant to discretionary authority. The Opposition Aldermen argued in favor of an approach resembling the burden-shifting paradigm in Title VII employment discrimination litigation under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Their position was that in a nonfacial equal protection challenge, evidence that the government's reason for decision was pretextual can establish the claim. The district court properly rejected this argument. This court has declined previous invitations to import Title VII methodology into traditional rational-

basis equal protection analysis, *see Schroeder*, 282 F.3d at 951, and we are not inclined to revisit the issue here.

Aside from rejecting the Title VII approach, however, the district court did not definitively resolve the parties' dispute over the proper application of the rational-basis test. Instead, the court engaged in a heavily fact-bound analysis of the City's actions and subjected the City's fees payment decision to a degree of independent judicial appraisal that is inconsistent with the deferential rational-basis standard of review.

The City asserts it was error for the district court to permit any inquiry at all into the actual motivation for the City's payment decision. Because a governmental classification "must be upheld against equal protection challenge if there is *any* reasonably conceivable state of facts that could supply a rational basis for the classification," *Heller v. Doe*, 509 U.S. 312, 320 (1993) (emphasis added), the Supreme Court has held that the rational-basis test "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). The City argues that the rational-basis test is not an evidentiary inquiry into the government's true motives at the time of the challenged action, but, rather, a post hoc legal inquiry into whether there is *any* conceivable rational reason for the government's decision. The Opposition Aldermen counter that the City's version of the rational-basis test applies only to facial equal protection challenges, and theirs is an "as applied" challenge. As such, they argue, the focus is properly on evidence of the City's actual (discriminatory) reason for the fees payment decision.

The City is mostly right. To the extent the Opposition Aldermen insist the focus should be on evidence of discriminatory purpose, their argument is simply misplaced. The City has conceded that it treated the Opposition Aldermen

differently because of their membership in a group that opposed the City's remap ordinance; the only disputed question is whether that discriminatory treatment had a rational basis. The rational-basis test is a lenient standard; the government's action simply "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and *some* legitimate governmental purpose." *Discovery House*, 319 F.3d at 282 (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001)) (emphasis added). The government need not have articulated a reason for the challenged action at the time the decision was made. *Discovery House*, 319 F.3d at 282. Rather, "the burden is upon the challenging party to eliminate any 'reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (citing *Heller*, 509 U.S. at 320). This basic formulation applies whether the plaintiff challenges a statute on its face, as applied, or (as here) challenges some other act or decision of government. *Id.*; *see also Bell v. Duperrault*, 367 F.3d 703, 708 (7th Cir. 2004); *Schroeder*, 282 F.3d at 950-51; *Martin*, 295 F.3d at 712-13; *Hilton*, 209 F.3d at 1007-08; *Olech v. Vill. of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998), *aff'd*, 528 U.S. 562 (2000) (per curiam); *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995).

This is not to say that evidence of the government's actual reason for decision is always irrelevant in equal protection cases, however. It is the plaintiff's burden to prove the government's action irrational. The government may defend the rationality of its action on any ground it can muster, not just the one articulated at the time of decision (if a reason was given at all.) Our various departments and agencies of government make thousands of decisions every day; not every one will come with an explanation. The absence of an explanation, or even an incomplete, inadequate, or inaccurate explanation will not equate to a lack of rational basis—otherwise "the federal courts would be drawn deep

into the local enforcement of . . . state and local laws." *Hilton*, 209 F.3d at 1008. Accordingly, the reason stated at the time of the challenged action may be relevant but is not dispositive in the application of rationality review.

We note that the role of subjective motivation in "class of one" equal protection cases is uncertain. Some of our cases hold that a determination of "no rational basis" in "class of one" cases requires proof of "totally illegitimate animus toward the plaintiff by the defendant" or illegitimate reasons "of a personal nature unrelated to the duties of the defendant's position." *Id.*; *see also Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002); *Cruz v. Town of Cicero*, 275 F.3d 579, 587 (7th Cir. 2001); *Esmail*, 53 F.3d at 180. Other cases use the disjunctive and refer to "class of one" cases as requiring no rational basis *or* proof of illegitimate animus. *See Lunini v. Grayeb*, 395 F.3d 761, 768 (7th Cir. 2004); *Nevel v. Vill. of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002); *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). Still others have noted but not resolved the conflict. *See Ind. Land Co. v. City of Greenwood*, 378 F.3d 705, 713 (7th Cir. 2004); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 n.3 (7th Cir. 2004); *Bell*, 367 F.3d at 708 n.1.

This is not an "illegitimate animus" equal protection case. The Opposition Aldermen do not argue that Alderman Burke's decision was based on some subjective illegitimate reason, so we need not attempt to reconcile the "class of one" cases here. The burden was on the Opposition Aldermen to eliminate any conceivable rational basis for the City's attorneys' fees decision—not just the basis offered by Alderman Burke at the time of the denial, but those offered by the City in defense of this litigation.

The City argues that a municipality has a legitimate interest in defending the validity of its ordinances against legal challenge; the Opposition Aldermen do not really debate this proposition. The City also argues that it is

entirely rational for a municipality to decline to subsidize litigation that seeks to invalidate a duly enacted ordinance, even when those seeking the invalidation are some of its own elected officials. We agree. However contentious and divided the City Council may have been during the process leading up to the referendum, once the referendum was held, the City had a remapping ordinance on the books. That law, and the defense of its legality, became the official position of the City of Chicago and its governing body. The City was entitled to subsidize the litigation position of the aldermen who were defending the remap ordinance without also subsidizing the aldermen who sought to invalidate it.

This is essentially consistent with the reason Alderman Burke gave for denying the Opposition Aldermen's request for attorneys' fees; although he cited the attorneys' fees ordinance, the underlying rationale was that the City did not elect to finance litigation against itself. No doubt politics also factored in, or predominated; that does not make an otherwise rational decision irrational or render a legitimate government interest illegitimate.

"The guarantee of equal protection . . . is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McRae*, 448 U.S. 297, 322 (1980). Decisions about which activities should receive government subsidies and which should not are matters of policy and discretion and are especially inappropriate for judicial second-guessing under rational-basis review. *See Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 549 (1983) (granting tax exemptions to nonprofit veterans' lobbying organizations while denying tax exemptions to all other nonprofit lobbying organizations does not violate equal protection rights of nonexempt lobbying organization); *Harris*, 448 U.S. at 326 (upholding Hyde Amendment against constitutional challenge in which it was argued, *inter alia*, that Medicaid's provision of

medical subsidies to indigent women who carry their pregnancies to term but not those who undergo abortions violated equal protection).

Accordingly, the City's decision to deny the Opposition Aldermen's request for attorneys' fees while granting the request of the Administration Aldermen was rationally related to and furthered the City's legitimate interest in defending the legality of its remap ordinance. The only real dispute here is whether the City is precluded from relying on this rationale because it failed to adhere to it in the past, when the City paid the attorneys' fees for Alderman Burke's group of plaintiff-aldermen in the *Roti* cases. This was the core of the district court's holding: that the City must "live with" this prior decision and confer the same benefit (forever, apparently) on other aldermen who sue the City. This proposition is profound and, to our knowledge, without precedent. As a rule of law, it translates to this: the government is prohibited, in perpetuity, from defending itself against an equal protection challenge based on an otherwise legitimate and rational justification simply because that justification was not observed in a prior unrelated action.

Such a rule would wreak havoc on the orderly operation of government. We find no support for the proposition that the Equal Protection Clause so rigidly limits or "locks in" the government's decisionmaking discretion in this way. Government does not lose the right to enforce a legitimate and rational distinction by virtue of not having enforced that distinction in an unrelated matter years earlier. The City's decision to pay the attorneys' fees of Alderman Burke's group of plaintiff-aldermen in the *Roti* cases in the mid-1980s does not foreclose the City from defending against the present equal protection claim on the basis of the perfectly rational distinction between aldermanic litigation in defense of the City's duly adopted remap ordinance and aldermanic litigation attacking it.

To the extent the district court's decision is premised not on the difference in treatment between the Opposition Aldermen and the Administration Aldermen in the redistricting litigation but the difference in treatment between the Opposition Aldermen and the plaintiff-aldermen in the *Roti* cases (a possible alternative reading), the City argues that the difference was rationally justified by distinctions in time, political circumstances, and the nature and goals of the litigation. The "Council Wars" that gave rise to the *Roti* cases were characterized by infighting among two aldermanic factions competing for control of the City Council following the election of Mayor Washington as the City's first black mayor. The first of the *Roti* cases concerned the validity of certain resolutions regarding the operation and organization of the City Council during the political and legal turmoil that surrounded the redistricting of Chicago's aldermanic wards after the 1980 census. The resolutions were adopted in a chaotic episode in which the mayor convened a Council meeting but then immediately purported to adjourn it. *Roti I*, 450 N.E.2d at 467. The mayor and the 21 aldermen loyal to him then left the Council chambers, but 29 aldermen remained and adopted a number of resolutions pertaining to the number of standing committees, committee assignments, and other organizational changes. The mayor then vetoed some of the resolutions.

The group of 29 aldermen quickly went to Illinois state court seeking a declaration that the resolutions had been lawfully adopted. The mayor responded with a suit of his own seeking to enjoin implementation of the resolutions. The lawsuits were consolidated and the 21 aldermen aligned with the mayor intervened on his side. The Illinois court held that the resolutions were validly adopted because the mayor's attempt to adjourn the Council meeting was invalid, as were his vetoes; the state appellate court affirmed. *Id.* at 472-76. The second of the *Roti* cases was

essentially the reverse of the first; it concerned the validity of a new resolution that reorganized the City Council once again after the conclusion of the redistricting litigation produced an even 25-25 split among the aldermen. *Roti II*, 500 N.E.2d at 464-65. The former aldermanic group of 29 (now reduced to 25) filed a declaratory judgment action in state court alleging that the new organizational resolution was improperly promulgated. The Illinois court held the resolution was validly adopted, and the state appellate court affirmed. *Id.* at 468.

The City suggests that the extraordinary political circumstances of the "Council Wars" and the legal exigent circumstances of the *Roti* cases provide a rational basis for the difference in treatment of the plaintiff-aldermen there and the plaintiff-aldermen here. We agree. The *Roti* cases raised the question of whether the City Council was validly organized and operating; the City had a legitimate and urgent interest in an authoritative legal determination of this question so the power struggle would not paralyze the affairs of municipal government or call into question the legitimacy of subsequent actions taken by the Council. Payment of both sides' attorneys' fees furthered that interest. On the other hand, the redistricting litigation of the 1990s did not threaten the very operation of the City Council or the legitimacy of its actions. There was no question that the remap ordinance had been validly adopted in the referendum vote and was law, and the City therefore had a legitimate interest in defending it against legal challenge. Declining to subsidize the aldermen who sued to invalidate the ordinance furthered that interest. The difference in treatment between the two groups of plaintiff-aldermen was not irrational.

At bottom, the Opposition Aldermen are complaining about what they perceive to be political gamesmanship, but political gamesmanship—if that's what Alderman Burke was up to—does not work an equal protection violation

unless the resulting decision lacks any rational basis. Even in "illegitimate animus" equal protection cases, "if the government would have taken the action anyway [absent the animus], the animus will not condemn the action." *Nevel,* 297 F.3d at 681; *see also Albiero,* 246 F.3d at 932; *Olech,* 160 F.3d at 388.

"The problems of government are practical ones and they may justify, if they do not require, rough accommodations,—illogical, it may be, and unscientific." *Metropolis Theater Co. v. City of Chi.*, 228 U.S. 61, 69-70 (1913). The rational-basis test is deferential to the decisions of government, but the district court applied it as if it were a more exacting standard, insisting on a degree of consistency that the Equal Protection Clause does not require. "Mere errors of government are not subject to our judicial review. It is only palpably arbitrary exercises which can be declared void under the 14th Amendment." *Id.* at 70. The City's refusal to pay the legal expenses of the Opposition Aldermen as plaintiffs in the redistricting litigation was rationally related to the City's legitimate interest in defending the legality of its ordinances; there was no equal protection violation here.

## B.  First Amendment Claim

The First Amendment does not provide an alternative basis upon which to uphold the judgment. In their free speech claim, the Opposition Aldermen asserted that the City engaged in viewpoint discrimination by refusing to pay their attorneys' fees in the redistricting litigation while agreeing to pay those of the Administration Aldermen. The district court properly rejected this argument. It is well-established that the government's "decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan*, 461 U.S. at 549. The Supreme Court has

"soundly rejected" the proposition that "if the government chooses to subsidize one protected right, it must subsidize analogous counterpart rights." *Rust v. Sullivan*, 500 U.S. 173, 194 (1991).

As "we have repeated many times, the Constitution, insofar as it creates or protects liberties, is . . . a charter of *negative* liberties." *Hilton*, 209 F.3d at 1007 (emphasis in original). As such, "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Maher v. Roe*, 432 U.S. 464, 475 (1977). The Constitution "does not confer an entitlement to such funds as may be necessary to realize all the advantages of" a constitutional right. *Harris*, 448 U.S. at 318. "[A]lthough government may not place obstacles in the path of a [person's] exercise of . . . freedom of [speech], it need not remove those not of its making." *Regan*, 461 U.S. at 550-51 (quoting *Harris*, 448 U.S. at 316).

The Opposition Aldermen rely on *Rosenberger v. Rector and Visitors of University Of Virginia*, 515 U.S. 819 (1995), and *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), but neither case is applicable here. *Rosenberger* involved the question of viewpoint discrimination within a speech forum created by a student organization fund established by a public university to encourage a diversity of views from private speakers. *Rosenberger*, 515 U.S. at 834. *Velazquez* involved a First Amendment challenge to a particular advocacy restriction in the federal subsidy program that established the Legal Services Corporation to provide funding for indigents' private civil litigation. *Velazquez*, 531 U.S. at 536.

This case involves neither a City-created speech forum nor a generalized City subsidy program for private litigation. Rather, the City agreed to pay the litigation expenses of the aldermen who entered the redistricting litigation in

defense of the City's remap ordinance. The positions of the City and the Administration Aldermen were thus aligned in the redistricting litigation, and in that sense, the Administration Aldermen's "speech" was the City's "speech." The government "speaks" when it acts to "promote its own policies or to advance a particular idea." *Id.* at 541.

The Administration Aldermen's defense of the legality of the remap ordinance plainly promoted the City's policy; the Opposition Aldermen's legal attack on the ordinance did not. *Velazquez* reiterated that "viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker." *Id. Rosenberger* and *Velazquez* do not support the Opposition Aldermen's free speech claim. *Rust*, *Regan*, *Harris*, and *Maher* foreclose it.

The judgment of the district court is REVERSED and the case is REMANDED for entry of judgment for the City of Chicago.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*